**Heather Sue MERCER, Plaintiff,**

v.

**DUKE UNIVERSITY, Defendant.**

No. 1:97CV00959.

United States District Court, M.D. North Carolina.

March 12, 2001.

Martha Melinda Lawrence, Burton Craige, Patterson Harkavy & Lawrence, Raleigh, NC, for Plaintiff.

John M. Simpson, Michelle C. Pardo, Fulbright & Jaworski, L.L.P., Washington, DC, for Defendant.

## MEMORANDUM OPINION

BEATY, District Judge.

This matter is presently before the Court on both Defendant Duke University's Motion for Judgment as a Matter of Law, and Defendant Duke University's Alternative Motion for a New Trial and/or a Remittitur [Document # 103]. Plaintiff Heather Sue Mercer has also filed a Motion for Attorneys' Fees [Document # 118]. For the reasons that follow, Defendant's Motion for Judgment as a Matter of Law, and its Alternative Motion for a New Trial and/or a Remittitur [Document # 103] are DENIED. For the reasons that follow, Plaintiff's Motion for Attorneys' Fees [Document # 118] is GRANTED.

### I. FACTUAL AND PROCEDURAL BACKGROUND

This is a gender discrimination action in which Plaintiff, Heather Sue Mercer ("Plaintiff" or "Mercer"), has alleged that Defendant, Duke University ("Defendant", "Duke", or "the University"), discriminated against her on the basis of her sex. Plaintiff brought her claim pursuant to Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. §§ 1681–1688.

In high school, Mercer served as the field goal place kicker for her high school football team. To improve her kicking abilities, Mercer attended various football camps that specialized in training and developing field goal kickers. Based upon Mercer's successful high school football experiences as a place kicker, Mercer decided to continue place kicking at another level and to pursue a position as a football place kicker in college.

Mercer entered Duke as a freshman in August of 1994 and attended the University as a full-time student until her graduation in May of 1998. In September 1994, Mercer went to the Duke football office to discuss with Fred Goldsmith ("Goldsmith"), the head football coach, her interest in being a walk-on place kicker for the football team. Although it was clear that Duke was not required by Title IX to

afford females the opportunity to play football, Goldsmith unilaterally made the decision during this meeting, without consulting with higher-ranking Duke officials, to give Mercer a "try-out." [1]

On October 3, 1994, Goldsmith, while dressed in a suit and tie, along with Fred Chatham ("Chatham"), the kicking coach, escorted Mercer to the football field, where they conducted Mercer's try-out. Both Chatham and Goldsmith testified during the trial that the conditions under which Mercer tried out were not ideal. More specifically, they admitted that they were unable to snap the ball or hold it in the proper way for Mercer to kick it. Given the kicking conditions, Mercer, by her own admission during trial, did not perform well. After the try-out, Goldsmith told Mercer that she had not made the football team because her kicking skills were not where they needed to be, but that she could help the team in a managerial capacity instead. The evidence showed that prior to Mercer's try-out, Goldsmith had never required another player to try out, if the player expressed an interest in walking on to the team.

During the 1994–1995 football season, Mercer attended all practices and games, participated in winter conditioning, and helped shag balls and keep statistics for the team's place kickers. In the spring of 1995, Mercer again sought a place on the team as a place kicker. In fact, she participated in spring 1995 practice with the other players. Spring practice itself was an important time in that it provided players with the opportunity to move up on the depth charts by impressing the coaches with their abilities. Moreover, spring practice concluded with the intra-squad "Blue–White" scrimmage, another event during which players were permitted to showcase their talents. Plaintiff's evidence revealed that the senior team members generally picked the team members for this game and that the "Blue–White" scrimmage was particularly important to the seniors because it provided the winning side certain "bragging rights." (Tr. at 70, Testimony of Redmon.)

According to Plaintiff, she was the first place kicker chosen from those place kickers who were available during spring prac-

---

**1.** The regulation developed by the Department of Health, Education, and Welfare for applying Title IX to athletic programs is instructive as to this point. Section (a) of the regulation provides:

No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.

34 C.F.R. § 106.41(a). On the surface, this subsection standing alone would have required covered institutions to integrate, that is, in terms of gender, all of their sports teams, making them all open to both men and women. However, the first sentence of subsection (b) of the regulation provides an explicit exception to avoid this possibility.

Pursuant to subsection (b), in cases where a recipient of federal funding "operates or sponsors a team in a particular sport for members of one sex," but does not do so for members of the other sex, "and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport." *Id.* § 106.41(b). Football is one of the specifically identified contact sports. *See id.* Therefore, at the onset, Goldsmith was not required to allow Mercer to try out. *See Mercer v. Duke Univ.,* 190 F.3d 643, 647 (4th Cir.1999).

Despite the regulation's instruction as to contact sports, however, if a member of the opposite sex is allowed to play on a contact sport team, the Fourth Circuit has held that she must be treated equally to male players, while on the team. *See id.* at 647–48.

tice. Two other prospective walk-on place kickers, Ted Post and Pat Tillou were chosen after Mercer had been selected.[2] Mercer's team, the Blue team, was behind by one point and in field goal position with one minute remaining in the game. Mercer was called upon by Goldsmith to kick a field goal. Mercer successfully kicked a 28-yard field goal, winning the game for her team. Goldsmith then announced to Mercer and others that Mercer had made the team.

As a result of extensive publicity and widespread interest in Mercer being the first female to make the Duke football team, Goldsmith became concerned that Mercer's presence on the team might have an adverse effect on his players and recruiting. He became more concerned as a result of the publicity that arose from an article published in a Georgia newspaper. The article made light of the fact that Duke had a female football player and caused Goldsmith to express a belated concern that Mercer's presence on the team could be more harmful than helpful. More specifically, Goldsmith alleged that her presence on the team posed a threat to the psyche of the team in that team members who actually played might have become discouraged by the amount of undue media attention that Mercer would generate whether she actually played in a game or not.

Goldsmith first began to take steps to discourage Mercer's participation on the team when he advised her during the summer of 1995 that she would not be permitted to attend pre-season camp. The initial explanation given for his decision was that the NCAA limited the number of players who could attend pre-season camp to 105. The evidence showed, however, that 105 players did not, in fact, attend camp. Despite Goldsmith's refusal to extend Mercer an invitation, Mercer was still a member of the team at the time Goldsmith decided who would attend camp, and Mercer had not been advised otherwise about her status on the team.

Mercer wrote Goldsmith a letter in June of 1995, reiterating her desire to attend pre-season camp and explaining how important it was to her to bond with the other team members. Goldsmith responded to the letter by calling Mercer at her parent's home in New York. After remind-

---

**2.** In an effort to downplay Mercer's skills and the fact that she was the first place kicker designated to a team, Goldsmith testified during trial that the place kickers and the punters were not selected by the seniors, but were instead placed on teams by Goldsmith in an effort to evenly distribute the talent. According to Goldsmith, Mercer and Tillou, the poorest kickers, were assigned to the same team as Spence Fisher, a talented quarterback for the team. Previously in his deposition, Goldsmith had stated that Mercer and Tillou were assigned to the same team as John Krueger, a talented punter for the team. Ultimately, it was determined that John Krueger, unlike Mercer, was on the White Team. Goldsmith, however, did note during trial that he was mistaken in his deposition when he stated that Mercer was placed based on the team to which Krueger was assigned. (Tr. at 54–58, Testimony of Goldsmith.)

Contrary to Goldsmith's testimony, Tijan Redmon, a scholarship football player who played fullback, tailback, receiver, defensive back, and special teams, including the field goal, extra point special team, and who was a senior at the time of the 1995 scrimmage, testified that the seniors picked the teams for the scrimmage with respect to all positions, including the place kickers, and that Mercer was chosen first over Post and Tillou based on her abilities. (Tr. at 70–74, Testimony of Redmon.) Dr. Carlos Bagley, who was a rising senior and a starting linebacker at the time of the scrimmage, also testified that the seniors picked the place kickers and that Mercer was chosen first because she was the better of the three available kickers. (Tr. at 74–78, Testimony of Bagley.)

ing Mercer that she would not be permitted to attend camp, Goldsmith asked her why she was still interested in football. In addition, Goldsmith suggested to Mercer that she consider other extracurricular activities, such as beauty pageants. During trial, Goldsmith did not deny making these remarks to Mercer, but claimed, instead, that he did not remember the specifics of the conversation.

Later in the summer, before pre-season camp had commenced, Goldsmith sent all of the team members, including Mercer, a motivational letter describing his expectations for the team in the upcoming months. (Pl.'s Ex. 11, Letter from Goldsmith.) Mercer's letter, perhaps like all the others, addressed the team members generically ,by referring to them as "Men." Goldsmith made it a point to personalize Mercer's letter by including a written request for her to "excuse" the gender-focused nature of the salutation. (*Id.*) However, Goldsmith failed to indicate why he did not simply change the salutation in Mercer's letter, instead of writing her a personal note of apology.

Upon arriving back at Duke for the fall of 1995 school year, Mercer along with her mother, Diane Mercer ("Mrs.Mercer"), met with Goldsmith to discuss Mercer's status on the football team. During this meeting, Goldsmith told Mercer and Mrs. Mercer that his decision to put Mercer on the team was the worst decision he had ever made in his life. Goldsmith shared with Mercer and her mother a story about one of his own daughters who had played on an all-male baseball team when she was younger. Goldsmith then explained to them that his daughter had outgrown "little boys' games" and advised Mercer that she should, likewise, outgrow her interest in being on the Duke football team. Goldsmith further recommended that Mercer consider trying out for the cheerleading squad. He commented on how pretty she was and informed her that when people asked him what she looked like, he compared her to the actress Molly Ringwald.

Also during this meeting, Goldsmith told Mercer and Mrs. Mercer that Mercer would not be issued a uniform or pads for the coming season, including practice. In fact, Mercer was informed that she would not be allowed to dress out for games or to stand on the sidelines with the rest of the team during home games. Goldsmith explained that if he allowed Mercer to stand with the team, her presence would create an undesirable "Heather Sue Media Watch." To avoid such unwanted media attention, Goldsmith instructed Mercer that she should instead sit in the stands "with her boyfriend."

On August 25, 1995, after Mercer's meeting with Goldsmith, the Duke Sports Information Office issued a press release announcing that Mercer was "not on [the] active roster" for the football team. This was a new status that was created solely for Mercer. No other member of the football team had ever received such a designation. Specifically, the press release contained the following statement:

> ... Heather Sue Mercer will not be an active part of the Duke Football team, head coach Fred Goldsmith announced today. Mercer, a sophomore at Duke who joined the team last fall as a student manager, will take on that same capacity this season.
>
> 'Basically, Heather Sue's situation will be pretty much the way it was last season when she came out,' Goldsmith said. 'She will work out in shorts with our kickers, trying to strengthen her leg and learn from them, but she will not be an active part of our team. She will not dress out for games. She will only kick on the kickers' field with the kickers.

She won't be part of kicking field goals with our offense. . . .'

(Pl.'s Ex. 8, Duke's Press Release.)

Because of the interest that Mercer's "membership" on the football team had generated, Mercer was requested to meet with the press concerning her status on the team. When she expressed reluctance in doing so, she was advised that she was required to meet with the press as part of her obligation to the team. Therefore, after the Duke Sports Information Office issued its statement, Mercer appeared before the press and read the following statement:

> . . . . On August 23rd, . . . Coach Goldsmith told me that his announcement to the press that I had made the team was one of the biggest mistakes he had ever made. . . . I had noted in him a certain lack of enthusiasm for my presence on the team soon after the spring scrimmage. At the beginning of finals week, he called me in to say that I would not be invited to attend the summer training camp. . . . [H]e told me that the NCAA limits participation at summer camp to 105 prospective team members, and that it was his practice to have no more than three kickers in attendance . . . . I was . . . surprised when I learned that Coach Goldsmith eventually decided to have all of the kickers at summer training camp except for me. . . . I began to realize that the coach was quite unhappy with my presence on the team, and I felt that he would like me to quit. I will not be quitting.

> Two days ago, Coach Goldsmith told me that I will not be dressing for home games. . . . Essentially, I will be treated like an injured player. I will watch all games from the stands. He has also said that although he will allow me to kick with the other guys during practice, I will not be issued pads and a uniform

like I was during the try-outs in the spring. I regret to say it, but it is a fiction that I am a member of the Duke football team. I believe that if I were a man and had the same kicking skills that I have now, I would be a member of the Duke football team. . . .

(Pl.'s Ex. 17, Mercer's Statement to the Press.)

It is important to note at this point that both University President Nan Keohane and Athletic Director Tom Butters indicated during their trial testimony that they were likely aware of the statements made to the press by the Sports Information Office and by Mercer. In addition, as will be revealed in discussions that follow, neither President Keohane, Athletic Director Butters, nor anyone else representing Defendant undertook any further investigation of the public complaint made by Mercer that she was being treated differently because of her gender. Instead, each Duke representative, for his or her own reasons, deferred this matter to someone else upon the assumption that the situation with Mercer would be taken care of.

Notwithstanding the unique membership status created for Mercer, that being a non-active member of the football team, Goldsmith repeatedly acknowledged that Mercer was a member of the team during the 1995–1996 football season. In fact, Duke listed Mercer as a team member in its official media guide and in the official roster that it submits to the NCAA. (Pl.'s Ex. 14, NCAA Roster.) Mercer, however, was the only member of the team who was not issued a uniform or pads for the fall of 1995 season. Despite this fact, Mercer participated in winter conditioning with the rest of the team without anyone telling her that she could not do so. In fact, Goldsmith was aware of her participation in winter conditioning and acknowledged that fact during the trial.

Plaintiff contends that Goldsmith's differential treatment of her continued into the spring practice of 1996, in that, again, she was the only player who did not receive a uniform or pads during this period. At the conclusion of spring practice in 1996, Mercer was not given any particular information as to her status on the team. Goldsmith contends that all team members knew to meet with the coaches at the end of the spring, to find out where they stood for the 1996–1997 season. Goldsmith further contends that Mercer was not told anything about her status after spring practice because she failed to talk to any of the coaches.

Upon Mercer's return to school in the fall of 1996, Goldsmith called her into his office and informed her that there was no place for her on the team. Other than Mercer, no member of the Duke football team, walk-on or otherwise, had ever been dismissed by Goldsmith for performance reasons. Goldsmith could only recall one other incident during his tenure as coach where a player had been dismissed from the team, but that particular player was dismissed for insubordination and frequent temper tantrums. (Tr. at 241–42, Testimony of Goldsmith.) Mercer's poor performance, however, was offered by Goldsmith during trial as the reason he dismissed Mercer from the team. Specifically, Goldsmith stated that Mercer was a poor kicker, given her low trajectory and her inability to kick long distances. Goldsmith also attributed his decision to cut Mercer from the team to the fact that she was unable to make any meaningful contribution to the team as a member of the scout team. Despite Goldsmith's contentions, however, the evidence showed that Goldsmith rarely observed Mercer's kicking and that he generally did not allow Mercer to kick from long distances when the other place kickers were allowed to do so.

Plaintiff presented various evidence of her kicking abilities during the time that she was on the team, and Plaintiff's evidence was in total contrast to Goldsmith's alleged opinion of her skills and Goldsmith's alleged reasons for Plaintiff's dismissal. For example, both Bill Renner, a football coach and former college and professional football player, and Paul Woodside, an assistant high school football coach and former college football player, had observed and coached Mercer on various occasions during summer kicking camps managed by Renner. Both coaches testified during trial that Goldsmith's negative statements about Mercer's kicking ability were inconsistent with what they had observed.

Although Goldsmith cut Mercer from the team during the fall of 1996 season, Mercer again joined the team members in the winter of 1997 for winter conditioning sessions in hopes of making the team for the 1997–1998 football season. At some point during one of these conditioning sessions, Goldsmith pulled Mercer aside and told her that she had "no right" to be there. Goldsmith then instructed her to leave. After that incident, Mercer made no other attempts to continue as a member of the Duke football team.

By the spring of 1997, Mercer had contacted an attorney concerning the treatment she had received by Defendant while on the football team. Mercer's attorney sent a letter to the University Counsel (the "Counsel") at Duke, informing the Counsel that Goldsmith had discriminated against Mercer while she was on the team by treating her differently than the other members because of her gender. The Counsel was informed that Mercer wanted, at that point, to meet with a Duke representative to discuss the bases for Mercer's allegation and the appropriate remedial ac-

tion to be taken in response to the discriminatory conduct about which Mercer complained. Duke officials, including President Keohane and Athletic Director Butters, opted not to meet with Mercer because of their concerns about the possibility of a lawsuit.

Although neither Keohane nor Butters met with Mercer, Kate Hendricks, as a member of the Counsel, undertook an internal investigation of Mercer's claim after receiving the letter from Mercer's attorney. This investigation consisted of a meeting with Goldsmith, Hap Zarzour, the team trainer, and perhaps Chatham, the kicking coach for the team. After talking to Goldsmith and Zarzour, Hendricks formed the opinion that there was no validity to Mercer's claim and notified Mercer's attorneys of her conclusion. Subsequently, Mercer filed suit against Duke, alleging, among other things, gender discrimination in violation of Title IX.[3] During the fall term of court for the Middle District of North Carolina, which began on October 2, 2000, a jury trial was conducted based upon Mercer's gender discrimination claim against Defendant. For reasons stated prior to the trial, the Court conducted a bifurcated proceeding as to the issues of liability and damages. Based on the evidence presented, the jury concluded that Goldsmith had discriminated against Mercer on the basis of her gender and that Duke was liable for such discrimination under Title IX. In a separate deliberation solely on the issue of damages, the jury awarded Mercer $1 in compensatory damages and $2,000,000 in punitive damages. This matter is currently before the Court both on Defendant's Motion for Judgment as a Matter of Law, and its Alternative Motion for a New Trial and/or a Remittitur [Document # 103]. The matter is also before the Court on Plaintiff's Motion for Attorneys' Fees [Document # 118]. Each of these motions is next addressed in turn.

## II. STANDARD OF REVIEW AND ANALYSIS

### A. *Motion For Judgment As A Matter of Law*

Rule 50 of the Federal Rules of Civil Procedure provides that a motion for judgment as a matter of law should be granted only if "there is no legally sufficient evidentiary basis for a reasonable jury to find for [the prevailing party]." Fed.R.Civ.P. 50(a) (Judgment as a Matter of Law). If a court opts not to grant a motion for judgment as a matter of law made at the close of all of the evidence, "the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Fed.R.Civ.P. 50(b) (Renewing Motion for Judgment After Trial). "In ruling on a renewed motion, the court may: ... if a verdict was returned: (A) allow the judgment to stand, (B) order a new trial, or (C) direct entry of judgment as a matter of law." *Id.* The court may not enter judgment as a matter of law, however, unless the record as a whole "supports only one reasonable verdict, in favor of the moving party." *Williams v. Cerberonics, Inc.,* 871 F.2d 452, 458 (4th Cir.1989). Moreover, in making its determination on whether a motion for judgment as a matter of law should be granted, the Court cannot weigh the evidence or assess the credibility of witnesses. *See Murdaugh Volkswagen, Inc. v. First Nat'l Bank,* 801 F.2d 719, 725 (4th Cir.1986)

---

**3.** Title IX provides:
No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance....
20 U.S.C. § 1681(a).

(recognizing that a court may not substitute its judgment for that of the jury or make credibility determinations); *Anheuser–Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 318 (4th Cir.1992) (same), *cert. denied*, 506 U.S. 872, 113 S.Ct. 206, 121 L.Ed.2d 147 (1992). Rather, the Court must "view the evidence in the light most favorable to the non-moving party and draw legitimate inferences" in the non-movant's favor. *Id.* Given the standard for such motions, the defendant bears a heavy burden in establishing that the evidence is insufficient to uphold the jury's verdict. *See Price v. City of Charlotte*, 93 F.3d 1241, 1249 (4th Cir.1996), *cert. denied*, 520 U.S. 1116, 117 S.Ct. 1246, 137 L.Ed.2d 328 (1997).

In its post-trial motions, Defendant contends that it is entitled to Judgment as a Matter of Law for the following reasons: (1) Defendant has presented legitimate, non-discriminatory grounds for its conduct toward Mercer and her status on the University football team, in that it has shown that Mercer lacked the qualifications and ability to remain on the team; (2) Defendant cannot be held liable for Goldsmith's actions, even if his actions are found to be discriminatory, because Plaintiff failed to establish at trial that Defendant had actual notice of Mercer's claim of gender discrimination, and because, even if Defendant had actual notice of Mercer's claim, Plaintiff failed to establish that Defendant acted with deliberate indifference to Mercer's claim; (3) The Court erred in determining, as a matter of law, that Defendant could be held liable for the harm allegedly caused by Goldsmith, because Goldsmith was an official policy-maker for the University for Title IX liability purposes;[4] (4) Punitive damages are not available under Title IX, even if Defendant may be held accountable for Goldsmith's conduct; and (5) Even if punitive damages are available in a Title IX lawsuit, the jury's award of punitive damages was not supported by the evidence in this case.[5] Each of Defendant's grounds for its Motion for Judgment as a Matter of Law is next addressed in turn.

### 1. Legitimate, Non-discriminatory Reasons for Defendant's Actions

■ Defendant first contends that legitimate, non-discriminatory reasons prompted its decisions with respect to Mercer's membership on the football team. Accordingly, Defendant alleges that the jury could not have concluded, based on the evidence, that Defendant discriminated against Mercer based on her sex. Given the abundance of direct evidence of discrimination that Plaintiff presented to the jury, specifically the evidence of various gender-related statements made by Goldsmith to or about Plaintiff, the Court deems it appropriate to analyze Defendant's motion for judgment as a matter of law under the *Price Waterhouse* mixed

---

**4.** Counsel for both sides were in fact notified that the Court had determined as a matter of law that Goldsmith was a policy-maker for Defendant with respect to the Title IX decisions made for the University. This finding alone under the *Gebser* decision would have been grounds to submit an issue of damages to the jury. Counsel were further advised that because of the Court's finding that Defendant was liable for Goldsmith's conduct under this alternative basis of liability, the issue of Mercer's damages would be submitted to

the jury, even if the jury determined that Defendant was not liable to Mercer on the basis of receiving actual notice of her claim and then acting with deliberate indifference to the claim.

**5.** As best as the Court could determine, Defendant's post-trial Motion for Judgment as a Matter of Law was based solely on the aforementioned factors.

motive proof scheme.[6] *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 258, 109 S.Ct. 1775, 1795, 104 L.Ed.2d 268 (1989). Under the *Price Waterhouse* mixed-motive proof scheme, a plaintiff establishes discrimination if she proves that her gender was a *motivating factor* in the alleged discriminatory decision. *See id.* at 241, 109 S.Ct. at 1785. It is not necessary for a plaintiff to show that the adverse decision was made solely because of her gender, because even decisions made based on a mixture of legitimate and illegitimate. considerations are actionable under Title IX. *See id.* Instead, once a plaintiff has shown that gender was a motivating factor in the decision made, the burden shifts to the defendant to prove by a preponderance of the evidence that it would have made the same decision with respect to the action taken absent consideration of the plaintiff's gender. *See id.* at 252, 109 S.Ct. at 1793. Therefore, Defendant's burden is not merely to show that it could have made the same decision based upon legitimate, non-discriminatory factors; it must show, instead, that at the time of the decision, it would have decided in the same way based upon a legitimate, non-discriminatory factor. *See id.* at 241, 109 S.Ct. at 1785.

 Given this standard, Defendant argues that judgment should be entered in its favor because it "advanced several legitimate, non-discriminatory reasons for its decision, namely Mercer's lack of kicking ability and contribution to the team as compared to the other Duke kickers."

(Def.'s Mem. in Supp. of Def. Duke University's Renewed Mot. for J. as a Matter of Law, or in the Alternative, for a New Trial or a Remittitur (Hereinafter, "Defendant's Brief") at 5.) However, upon examining the evidence as a whole, this Court concludes that there was a legally sufficient basis for the jury to conclude that Duke would not have made the same decisions with respect to Mercer's membership on the football team had it not considered her gender. Some of the evidence presented that demonstrates that Plaintiff's gender truly was a motivating factor in Defendant's decision is summarized as follows:

The evidence revealed that Mercer was the first person that Goldsmith ever dismissed for "lack of ability." The difference in the treatment afforded to Mercer is recognizable, especially, in view of the fact that other place kickers on the team, by Goldsmith's own admission, lacked the skills necessary to ever play in a football game at Duke. Goldsmith also admitted that Mercer was at least as skillful at place kicking as Pat Tillou, a male place kicker who was not dismissed for lack of kicking ability. Not only was Tillou not dismissed, but unlike Mercer, Tillou was instead given the opportunity to play on the scout team. Defendant has not presented anything new before this Court that would suggest that a jury viewing this evidence could not have found this conduct to be discriminatory. In fact, the jury's conclu-

---

**6.** In this case, Goldsmith's gender-biased comments to Mercer concerning her role on the football team justified the use of a mixed-motive analysis to analyze Defendant's post trial motions. The specific evidence presented during the trial revealed the following examples of Goldsmith's gender-related remarks: (1) Goldsmith tried to discourage Mercer's participation on the team by suggesting that she instead participate in beauty pageants and on the Duke cheerleading squad; (2) Goldsmith told Mercer that she should sit in the stands with her boyfriend, rather than standing on the sidelines with the rest of the team; (3) Goldsmith commented that Mercer was pretty and looked like Molly Ringwald when people inquired about her as a member of the team; and (4) Goldsmith tried to convince Mercer that football was not the sport for her by explaining to her that she should outgrow little boys' games like his daughter had done.

sion may be validated by comparing the skills of Tillou to Mercer's. Specifically, team members Redmon and Bagley acknowledged that the skills Mercer possessed as a kicker, at the time of the "Blue–White" scrimmage game, were not only better than those possessed by Tillou, but also better than Post's skills, another male place kicker who remained on the team. Indeed, other seniors on the team must have shared Redmon's and Bagley's view of Mercer's relative skills in that Mercer was selected first as a place kicker, by all of the seniors on the Blue team, during the scrimmage, ahead of both Tillou and Post.

. Goldsmith's claim that Mercer's lack of ability provided a legitimate and non-discriminatory reason for her removal from the team is further belied by Goldsmith's own announcement when he first placed Mercer on the team. Specifically, Goldsmith, in an unequivocal statement, advised Mercer that she was on the team, without any restrictions being placed on what her role would be. Goldsmith, undoubtedly, was aware of Mercer's abilities at that time, based upon his observations of her during practice, the progress she had made from the initial try-out, and her performance in the "Blue–White" scrimmage. In fact, in Goldsmith's press release of April 15, 1995, Goldsmith, following his decision to place Mercer on the team, made the following statements about her performance in the "Blue–White" scrimmage: "[T]hat was something unique and special. She has worked hard and has done well throughout the season." (Pl.'s Ex. 8, Apr. 15, 1995 Statement to the Press.) The jury, upon viewing this evidence, would have reason to question the legitimacy of Goldsmith's later statement that Mercer was dismissed from the team based upon her lack of ability. In fact, if anything, the evidence presented during trial does not suggest that Mercer's skills declined after she joined the team, but, rather, that her skills and leg strength improved. Certainly the jury could have concluded from these facts both that Goldsmith's decision to place Mercer on inactive status was prompted by her gender and that Goldsmith would not have placed Mercer on such a status had he not taken her gender into account.

■ Plaintiff presented other evidence from which the jury could have drawn support for its finding that Goldsmith's alleged reasons for dismissing Mercer were pretextual. This includes evidence that established that Mercer was the only player on the team not issued pads or a uniform and that she was the only place kicker not allowed to participate on the scout team. When questioned about these facts, Goldsmith's response was that his decisions in both respects were not made based upon Mercer's gender. First, with respect to Mercer not receiving pads or a uniform, Goldsmith testified that it was his policy to issue a uniform and pads only to those team members who played first or second string or who alternatively played scout. Because Mercer did not meet either of these requirements, Goldsmith testified that Mercer did not need pads or a uniform. Second, with respect to Mercer's participation on the scout team, Goldsmith explained that Mercer was not given the option of participating on the scout team, although all of the other walk-on *male* place kickers were given such an option, because Mercer was too slow and too small to play scout. Goldsmith also testified that he believed Mercer might get hurt playing on the scout team. Despite Goldsmith's testimony, Plaintiff presented evidence from some of the team members, particularly Redmon and Bagley, which suggested that the size and the speed of Duke scout members were irrelevant and that the risk of scout members being hurt

was virtually nonexistent, because scout members were not required to operate at full speed, and because the contact between the players and the scout members during practice was infrequent. Goldsmith certainly had the opportunity to legitimately take all of his alleged concerns into account prior to making the decision to place Mercer on the football team; however, as previously noted, once a member of the opposite sex is given the opportunity to participate on a same-sex contact sports team, that member of the opposite sex must be treated equally and given the same types of opportunities that other members of the team are given. *See Mercer*, 190 F.3d at 647.

A final factor in support of the jury's conclusion that Goldsmith discriminated against Mercer based upon her gender was Goldsmith's decision to band Mercer from the sidelines during home games. Mercer, although still a member of the team, was the only player precluded from standing with the rest of the team. Instead of allowing her presence on the sidelines, Goldsmith informed Mercer that she should sit in the stands with her boyfriend. Goldsmith alleges that his decision was based upon his concern about the undue media attention that Mercer would generate for being a female place kicker, and the possible negative impact that such attention would have on the psyche of the starting football team members. Given the rationale offered by Goldsmith for his decision, the jury reasonably could have viewed Goldsmith's decision to exclude Mercer from the sidelines as being motivated, in part, by Mercer's gender, and the media attention that Mercer, as a *female*

player on the team, would generate. For all of the other reasons mentioned above, the Court finds that Defendant is not entitled to judgment as a matter of law because the jury could have reasonably found that Defendant failed to proffer legitimate, non-discriminatory reasons for its adverse actions with respect to Mercer. Furthermore, from the evidence presented, the jury could have reasonably found that Goldsmith would not have made the same decisions with respect to Mercer's participation as a member of the team had Goldsmith not considered her gender.

### 2. *Prerequisites For Determining Defendant's Title IX Liability*

In view of the manner in which Mercer's claim was submitted to the jury, Defendant's Motion for Judgment as a Matter of Law with respect to whether Defendant itself could be held liable for Goldsmith's actions must be assessed in light of the standard of review set forth by the United States Supreme Court in *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998). In *Gebser*, the Court established a three-pronged test for determining whether an institution may be held liable for the acts of its employees, where no official policy of the recipient entity is involved. *See id.* at 290, 118 S.Ct. at 1999.[7] Specifically, the *Gebser* Court held that an institution will not be held liable in damages under Title IX for actions of its employees "unless *an official who at a minimum has authority to address the alleged discrimination* and to institute corrective measures on the recipient's be-

---

**7.** As previously stated, the Court will leave for separate discussion Defendant's request for judgment as a matter of law to the extent that it is based upon the Court's initial determination, as a matter of law, that Defendant could be held liable to Plaintiff, regardless of the jury's liability determination, because Goldsmith was an official policy-maker of Defendant, with respect to the decisions that he made about Mercer's membership on the team, for Title IX purposes.

half has *actual knowledge* of [the] discrimination" and responds with *deliberate indifference* thereto. *Id.* (explaining that Title IX liability is predicated upon notice to an "appropriate person" and an opportunity to remedy any violation). The Supreme Court felt it necessary to develop such a stringent standard so as to avoid institutional liability based upon principles of respondeat superior. *See id.* at 289–91, 118 S.Ct. at 1999.

### (a) *Actual Notice of Discrimination*

■ The first part of the *Gebser* test focuses on whether there was some official involved with the institution in question who had the authority to address the alleged discriminatory conduct. Defendant apparently does not dispute the fact that President Nan Keohane and Athletic Director Tom Butters were officials with authority to take corrective action in this case. Defendant instead focuses, in its motion, on the second prong of the *Gebser* test, that is, whether the requisite officials had actual notice of Plaintiff's claim. Specifically, Defendant contends that President Keohane and Athletic Director Butters did not have actual knowledge of Plaintiff's allegation, as *Gebser* requires. Defendant bases this allegation on the fact that Mercer "did not complain to any official at Duke about her alleged discriminatory treatment." (Def.'s Br. at 6–7.) Given this assertion, Defendant apparently contends that Mercer specifically had to report her claim of gender discrimination directly to President Keohane or to Athletic Director Butters. *Gebser*, however, does not impose such a requirement. 524 U.S. at 290, 118 S.Ct. at 1999 (discussing the notice requirement). Instead, in order for institutional liability to arise under the *Gebser* standard, the university official must simply have actual knowledge of the alleged discrimination, as opposed to having mere constructive knowledge of it.

*See id.* The source of the information, therefore, is immaterial to the analysis of whether liability attaches.

■ It is not necessary in this case to undergo an extensive fact analysis of whether the requisite officials for Defendant had actual knowledge of Mercer's claim of gender discrimination because both President Keohane and Athletic Director Butters admitted during trial that they were *actually* aware of Plaintiff's claim of gender discrimination. The fact that both are officials who could have corrected Goldsmith's conduct and that both admitted to being knowledgeable about Plaintiff's claim obviously constitutes sufficient evidence from which the jury could have concluded that the necessary officials for Defendant, under a *Gebser* analysis, had actual knowledge of Mercer's claim. Defendant's mere contentions to the contrary are not sufficient to entitle it to a Motion for Judgment as a Matter of Law. Defendant's motion in that respect is, therefore, DENIED.

### (b) *Evidence of Deliberate Indifference*

■ Duke next contends in support of its Motion for Judgment as a Matter of Law that the University cannot be held liable for Goldsmith's actions with respect to Mercer, even if those actions were discriminatory, because Plaintiff failed to present sufficient evidence of deliberate indifference. According to *Gebser*, an institution is deliberately indifferent to discriminatory conduct if the institution makes "an official decision ... not to remedy the violation." 524 U.S. at 290, 118 S.Ct. at 1999. Although responses that are "merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference," *Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 219 (5th Cir.1998), officials cannot simply "'turn a blind eye

and do nothing'" when a plaintiff's federally protected rights are being violated, *Kinman v. Omaha Pub. Sch. Dist.,* 171 F.3d 607, 610 (8th Cir.1999) (quotations omitted); *Vance v. Spencer County Public Sch. Dist.,* 231 F.3d 253, 262 (6th Cir.2000) (explaining that although Title IX "does not require specific responses, it does require a reasonable response").

In this case, Defendant initially relies on the testimony of President Keohane and Athletic Director Butters to support its argument that the jury's finding of deliberate indifference was not supported by the evidence. President Keohane, however, acknowledged that she first became aware of Mercer's claim of gender discrimination at least by the end of the 1995 year, as result of various informational sources, including information provided to her by Duke employees. In addition, President Keohane admitted that she also had a general idea of what Mercer was claiming as a result of a telephone call she received in the fall of 1995 from David Hamburg, President of the Carnegie Corporation. The evidence revealed that Mr. Hamburg advised President Keohane that he also had become aware of Mercer's statement that she would be playing on the football team if she were a man. Mr. Hamburg advised President Keohane that she should check into Mercer's claim of gender-based differential treatment. Despite this admonition and advice, President Keohane's response was very limited. Keohane admitted that she did not investigate Mercer's claim any further because she was advised by someone at Duke that Goldsmith was showing Mercer favoritism, and not discriminating against her, on the basis of her gender. Specifically, President Keohane testified, "... that Fred Goldsmith had in fact given [Mercer] a number of opportunities which she might well have not had had she not [sic] been a man...." (Def.'s Ex. E at 33.) Despite President Keohane's

notice of Mercer's allegation, she conducted no other investigation of Mercer's claim, but, rather, she deferred the matter to Athletic Director Butters. By Keohane's own admission, she had confidence that Butters would handle the matter as he deemed necessary.

■ Butters also testified that he became aware of Mercer's claim of gender discrimination at some point during the fall of 1995 season. However, he also failed to conduct an investigation because, much like President Keohane, he opted to defer the matter to Goldsmith, who he felt was capable of dealing with matters such as Mercer's. In particular, as to Goldsmith and his treatment of Mercer, Butters elected not to get involved in Mercer's allegation of gender discrimination because Butters felt that Goldsmith could correct his own wrongful conduct. Despite President Keohane's and Athletic Director Butters's admitted failure to respond to Mercer's allegation, Defendant, nonetheless, contends that the evidence presented during trial does not support a finding of deliberate indifference. However, Defendant fails to recognize that "[n]ot every feeble response to a student's complaint [of gender discrimination] will insulate [an institution] from liability under Title IX. The Court must examine the 'adequacy of the response' in light of the 'seriousness and credibility of the complaint that puts school officials on notice.'" *Gordon v. Ottumwa Cmty. Sch. Dist.,* 115 F.Supp.2d 1077, 1082–83 (S.D.Iowa 2000) (quotations omitted). Upon examining the lack of response by Keohane and Butters at the time that they first became aware of Mercer's claim in late 1995, the Court finds sufficient evidence from which the jury could have reasonably concluded that both of these officials, who had the authority to correct matters, responded with deliberate indifference to Mercer's federally protect-

ed right to be free from gender discrimination.

Alternatively, Defendant requests that the Court move the clock forward and determine whether Defendant acted with deliberate indifference based upon the Counsel's response to Mercer's claim of gender discrimination. The facts reveal that in the spring of 1997, Mercer's attorney sent a letter to the University outlining Mercer's claim and requesting that an official from the University meet with Mercer to discuss her allegation. Upon receipt of the letter, Kate Hendricks, Assistant University Counsel, engaged in a limited investigation, during which she spoke only with Goldsmith and Hap Zarzour, in order to assess the validity of Mercer's claim. Hendricks advised Mercer's attorney that her investigation revealed that Mercer's claim of gender discrimination was invalid. Based upon the response of the Counsel, Defendant contends that Mercer cannot establish deliberate indifference on the part of Defendant. Defendant further contends that its position is strengthened by the fact that at the conclusion of Hendricks's investigation, Mercer was extended an offer to try out for the team for the 1997–1998 season. This delayed effort by Defendant is not enough, however, to defeat the jury's finding of deliberate indifference, particularly in view of the requirement that an institution, or officials thereof, must respond in a *prompt, timely, and reasonable* manner to a plaintiff's allegations of discrimination, upon gaining knowledge of those allegations. *See Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, 649, 119 S.Ct. 1661, 1674, 143 L.Ed.2d 839 (1999) (discussing the reasonableness requirement); *Morlock v. West Central Educ. Dist.,* 46 F.Supp.2d 892, 904–05 (D.Minn.1999) (noting that a "Title IX fund recipient may be held liable for its failure to respond in a prompt and timely manner"). Although the Counsel conduct-

ed an "investigation" into Mercer's claim in the spring of 1997, Keohane and Butters, by their own acknowledgment, became aware, at least by the end of the fall 1995 season, of Mercer's claim of gender discrimination. However, neither Keohane nor Butters conducted an investigation at that time. Because Keohane and Butters were the first Duke officials, for whom Duke could be liable, to gain knowledge of Mercer's claim, the Court deems the point in time at which they gained knowledge to be the appropriate point in time from which to judge the reasonableness and timeliness of Defendant's response to Mercer's claim. Therefore, notwithstanding the limited investigation undertaken by the Counsel in 1997, this Court concludes that the period of delay from Keohane's and Butters's actual awareness of the claim, to the point at which the Counsel conducted its investigation of said claim could have properly been considered by the jury as evidence of deliberate indifference. For the foregoing reasons, to the extent that Defendant argues that its Motion for Judgment as a Matter of Law should be granted because there was insufficient evidence of deliberate indifference to Plaintiff's claim, Defendant's Motion for Judgment as a Matter of Law is DENIED.

### 3. *Goldsmith As An Official Of Defendant With Policy–Making Authority*

 As previously stated, the Court determined as a matter of law, prior to submitting the case to the jury on the issue of whether Defendant could be held liable for Goldsmith's actions under the deliberate indifference theory set out in *Gebser,* that Defendant could alternatively be held responsible for the alleged discriminatory actions of Goldsmith, because Goldsmith was an official for Defendant with policy-making authority with respect to the subject matter at issue. *See, e.g.,*

*Monell v. Department of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (first setting forth the policy-making authority theory of which *Gebser* speaks); *Brady v. Fort Bend County.*, 145 F.3d 691, 698 (5th Cir.1998) (citing *Monell* and explaining the final policy-making authority theory), *cert. denied,* 525 U.S. 1105, 119 S.Ct. 873, 142 L.Ed.2d 774 (1999). Pursuant to the policy-making authority theory, a plaintiff may recover damages if she can establish by a preponderance of the evidence that an official with policy-making authority with respect to the subject matter at issue engaged in discriminatory acts against her. *See Brady,* 145 F.3d at 698; *Jeffes v. Barnes,* 208 F.3d 49, 56–57 (2d Cir.2000), *cert. denied,* 531 U.S. 813, 121 S.Ct. 47, 148 L.Ed.2d 16 (2000). In essence, this means that an individual may be considered a policy-making official if the individual speaks with final policy-making authority for the defendant institution concerning the action alleged to have caused the violation of Title IX. As the parties were advised, this determination is a matter of law to be decided by the court and not by the jury. *See Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 2723–24, 105 L.Ed.2d 598 (1989) (addressing the issue in the context of municipal liability). Because the jury was not advised of the Court's ruling and because the jury reached a favorable verdict for Mercer against Defendant on the deliberate indifference theory, Defendant suffered no immediate prejudice from the Court's ruling as a matter of law. The Court fully explained its ruling and made it a part of the record during the course of the trial. It is not necessary for the Court to readdress this matter in response to Defendant's broad-brush approach in submitting its post-trial motions. Suffice it to say that the evidence revealed that all of the persons identified by Defendant at trial as purportedly having official policy-making authority for Defendant with respect to the Title IX issues that arose in this matter, observed the course of events unfold, but took no action while Goldsmith made each of the relevant decisions covered by Title IX.[8] These decisions covered a spectrum that ranged from deciding that Mercer, as a member of the opposite sex, could participate on a contact sport team, to ultimately taking actions against her with respect to her membership on the football team that could have been viewed by the jury as constituting gender discrimination. While Defendant would argue that Goldsmith's actions in this regard were not policy decisions, the Court finds that even the narrower decisions made by Goldsmith, with regard to Mercer's involvement with and participation on the football team, constitute "policy" as that term is defined in *Gebser.* For that reason, Defendant, under *Gebser,* could be held liable for Goldsmith's actions. *See, e.g., Seamons v. Snow,* 206 F.3d 1021, 1029 (10th Cir.2000) (explaining that only the Head Coach was vested by the school district with authority to make final decisions regarding membership on the football team, and holding that, because of this delegation of authority, the school district could be held liable for the Coach's decisions about team membership). For all of the foregoing reasons, Goldsmith was a final policy-maker with respect to Mercer's membership on the football team. Accordingly, to the extent that Defendant argues that its Motion for Judgment as a Matter

---

**8.** Defendant asserted during trial that athletic policy could only be made by the University Board of Trustees in conjunction with the recommendation of the University President who received advice from the Athletic Director and the Faculty Athletic Council. Defendant further suggested that it ultimately was the responsibility of the University Counsel's Office to assure compliance with Title IX.

of Law should be granted because Goldsmith did not have policy-making authority with respect to the subject matter at issue, Defendant's Motion for Judgment as a Matter of Law is DENIED.

### 4. *Availability Of Punitive Damages As A Title IX Remedy*

■ As an additional element offered in support of its Motion for Judgment as a Matter of Law, Defendant argued at trial and now contends that punitive damages are not available as a remedy for a Title IX violation, if a violation is found to exist. The Court disagrees based upon the authority established in *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), and subsequent court rulings. In *Franklin,* the Supreme Court was charged with determining whether a damages remedy was available for recovery in a private right of action brought under Title IX. The *Franklin* Court noted that "[i]n *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), the [Supreme] Court held that Title IX is enforceable through an implied right of action." *Id.* at 65, 112 S.Ct. at 1032. Although the Court did not specifically address whether punitive damages were available as a remedy under Title IX, the Court noted that a general presumption exists that "all appropriate remedies [are available] unless Congress has expressly indicated otherwise." *Id.* at 66, 112 S.Ct. at 1032 (noting that this presumption is deeply rooted in American jurisprudence). Therefore, "the general rule ... is ... absent clear direction to the contrary by Congress, the federal courts have the power to award *any* appropriate relief in a cognizable cause of action brought pursuant to a federal stat-

ute." *Id.* at 70–71, 112 S.Ct. at 1035 (emphasis added). In view of the fact that Congress had the opportunity to effect changes to the presumption created by *Cannon,* particularly when Congress amended Title IX by enacting both the Rehabilitation Act Amendments of 1986, 100 Stat. 1845, 42 U.S.C. § 2000d–7, and the Civil Rights Restoration Act of 1987, Pub.L. No. 100–259, 102 Stat. 28, the *Franklin* Court concluded that Congress' inaction demonstrated that Congress did not intend to abandon the traditional presumption in favor of all available remedies. 503 U.S. at 72–73, 112 S.Ct. at 1036. Furthermore, the *Franklin* Court concluded that there was no indication that "Congress has limited the remedies available to a complainant in a suit brought under Title IX." *Id.* at 73, 112 S.Ct. at 1036–37. Because all remedies are available in Title IX cases, punitive damages may be awarded for a violation of Title IX. In fact, the Fourth Circuit Court of Appeals found this to be the case in *Pandazides v. Virginia Board of Education,* 13 F.3d 823 (4th Cir. 1994). In *Pandazides,* the Fourth Circuit considered the issue of whether compensatory and punitive damages are available under Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C.A. § 794 (West Supp.1993). Although the court noted that it had previously decided that punitive damages and compensatory damages were unavailable under § 504, it decided, in light of *Franklin,* that punitive damages are available under § 504 because of the similarities between Title IX and § 504.[9] *See id.* at 831–32. Other courts, as well, have reached the same result, finding that the "full panoply" of remedies permitted by the *Franklin* Court

---

9. In view of *Franklin,* the Fourth Circuit's opinion in *Eastman v. Virginia Polytechnic Inst. & State Univ.,* 939 F.2d 204 (4th Cir. 1991), which held that compensatory and pu-

nitive damages were not available for causes of action brought under § 504, was determined to no longer be good law. *See Pandazides,* 13 F.3d at 830.

also includes punitive damages. *See Proctor v. Prince George's Hospital Center*, 32 F.Supp.2d 820, 829–30 (D.Md.1998) (explaining that the " 'full panoply' discussed in *Franklin* includes punitive damages" and that the majority of courts addressing the issue have so concluded); *Burns–Vidlak by Burns v. Chandler*, 980 F.Supp. 1144, 1147 (D.Haw.1997) (citing cases holding that the full panoply includes punitive damages), *appeal dismissed*, 165 F.3d 1257 (9th Cir.1999). This Court therefore concludes that punitive damages are available for private rights of action brought pursuant to Title IX. Accordingly, to the extent that Defendant's Motion for Judgment as a Matter of Law is based upon its argument that punitive damages are not available as a remedy for a violation of Title IX, Defendant's motion is DENIED.

### 5. *The Merits of Plaintiff's Punitive Damage's Claim*

▇ As a final basis for its Motion for Judgment as a Matter of Law, Defendant contends that even if punitive damages are available for a violation of Title IX, punitive damages are not warranted based upon the insufficiency of the evidence that Plaintiff presented during the trial. Defendant first contends that the jury's punitive damages award should not stand because "there is no evidence in the record indicating that Duke's conduct was malicious, evil, or sufficiently outrageous, or that Duke acted with reckless indifference to Mercer's federally protected rights." (Def.'s Br. at 11.) Pursuant to *Smith v. Wade*, 461 U.S. 30, 55–56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983), punitive damages are appropriate "when the defendant's conduct . . . involves reckless or

callous indifference to [the] federally protected rights of [an aggrieved individual]." *See also Preston v. Commonwealth of Virginia*, 31 F.3d 203, 207 (4th Cir.1994) (noting that "Title VII, and the judicial interpretations of it, provide a persuasive body of standards to which [a court] may look in shaping the contours of the private right of action under Title IX").[10] Given that this Court has previously concluded that sufficient evidence was presented from which the jury could have found deliberate indifference with respect to Defendant's liability for Goldsmith's conduct, the Court also necessarily finds that the same evidence previously cited provides sufficient evidence from which the jury could have found reckless indifference as required for an award of punitive damages. According to *Webster's Third New International Dictionary*, deliberate means, among other things, "characterized by presumed or real awareness of one's actions or sayings or by fully conscious often willful intent," whereas reckless means, among other things, "lacking in caution" and "marked by a lack of foresight or consideration." A finding of deliberate indifference by the jury would of necessity be inclusive of a finding of reckless indifference, as the jury considered the separate question of punitive damages. However, despite Defendant's contention that the jury was able to make a finding of punitive damages as a matter of course by collapsing the reckless indifference standard into the deliberate indifference standard, the jury was not instructed in that manner. Instead the jury was specifically instructed in this instance that not only was a showing of reckless indifference required before punitive damages could be awarded, but it was also instructed that punitive damages should only be

---

**10.** Pursuant to Title VII, a complaining party may recover punitive damages if the defendant acted "with malice or reckless indifference to the federally protected rights of [the] aggrieved individual." 42 U.S.C. § 1981a(b)(1).

issued in *extraordinary* circumstances. Thus, contrary to Defendant's contention, punitive damages were not automatic upon the jury's findings of deliberate indifference and Title IX liability.

 Finally, based upon the decision in *Canty v. Old Rochester Regional School District,* 66 F.Supp.2d 114 (D.Mass.1999), Defendant contends that it is entitled to Judgment as a Matter of Law because Mercer's evidence on the issue of punitive damages failed to reveal any ongoing, egregious acts of discrimination by Defendant. (Def.'s Br. at 11 n.3.) In making this argument, Defendant seemingly contends that *Canty* established a new and heightened standard for imposing punitive damages in a Title IX case. This, however, is not a correct reading of *Canty.* In *Canty,* a high school student sued her school district, as well as various other parties, seeking compensatory and punitive damages under Title IX. The student alleged that she had been sexually abused by her athletic coach. *See Canty,* 66 F.Supp.2d at 115. In proper context, the Court in *Canty,* in stating that "punitive damages may be appropriate if Canty can show that the school district has 'demonstrated complete indifference to the requirements of Title IX *and has committed ongoing egregious violations with no sign of relenting,'* " was making reference to an earlier decision it had reached on the school district's motion to dismiss Canty's claim for punitive damages under Title IX. *Id.* at 117 (emphasis added) (quotations omitted). The school district had contended that as a municipal entity it was not subject to punitive damages under Title IX. *See Canty v. Old Rochester Reg'l Sch. Dist.,* 54 F.Supp.2d 66, 69 (D.Mass.1999). In the first version of *Canty,* just cited, the court stated that "[s]ince municipal entities typically enjoy immunity from punitive damages under federal law, ... it is unclear whether the *Franklin* Court meant to include punitive damages against municipal entities as part of 'all available remedies.'" *Id.* (citations omitted). After acknowledging that the issue of punitive damages against a municipality was unsettled, the court cited a New Hampshire district court decision, which had recognized that:

> [I]n the *rare case* in which a local public school has demonstrated complete indifference to the requirements of Title IX and has committed *ongoing egregious violations* with no sign of relenting, a federal court might determine, in its discretion, that a punitive damages remedy for a private party is the best, or only, means of forcing the school district into compliance.

*Id.* (quoting *Doe v. Oyster River Coop. Sch. Dist.,* 992 F.Supp. 467, 483 n. 17 (D.N.H.1997) (Devine, J.)); *see also Booker v. City of Boston,* 2000 WL 1868180, *4 (D.Mass. Dec. 12, 2000) (citing *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 263, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981) (holding that municipalities are immune from punitive damages under 42 U.S.C. § 1983)). Both the courts in *Canty* and *Doe* were addressing the rare situation in which a school district, as a municipal entity, may be liable for punitive damages, where normally the district might be immune from such. Without generally deciding the issue of whether municipalities are immune from punitive damages, both courts merely noted that a federal court might indeed impose punitive damages, even against a municipal entity, as a means of forcing a school district into compliance, if, in addition to acting with deliberate indifference to the requirements of Title IX, the municipal entity also engages in "ongoing egregious violations with no signs of relenting." *Canty,* 54 F.Supp.2d at 69. This heightened standard would not be applicable to Defendant because Defendant is not a municipal entity. In-

stead, the general standard for punitive damages, that is, reckless indifference towards a federally protected right, is the appropriate standard for assessing Defendant's conduct. Given the appropriate standard for determining whether Defendant's officials were recklessly indifferent, the Court finds that there was sufficient evidence of Defendant's reckless indifference to Mercer's rights under Title IX from which the jury could have found support for its award of punitive damages. Therefore, to the extent that Defendant argues that its Motion for Judgment as a Matter of Law should be granted because there was insufficient evidence to support a punitive damages award, Defendant's Motion is DENIED.

**B.** *Defendant's Alternative Motion for a New Trial*

In addition to its Motion for Judgment as a Matter of Law, Defendant has also filed a Motion for a New Trial pursuant to Rule 59 of the Federal Rules of Civil Procedure. In considering a motion for a new trial, a court should set aside a verdict and grant a new trial if the court finds that " '[1] the verdict is against the clear weight of the evidence, or [2] is based upon evidence which is false, or [3] will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict.' " *Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.,* 99 F.3d 587, 594 (4th Cir. 1996) (quoting *Aetna Cas. & Sur. Co. v. Yeatts,* 122 F.2d 350, 352–53 (4th Cir. 1941)); *see also Johnson v. Parrish,* 827 F.2d 988, 991 (4th Cir.1987) (same). " 'Courts do not grant new trials unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done.' " *Vanwyk Textile Sys., B.V. v. Zimmer Mach. Am., Inc.,* 994 F.Supp. 350, 358 (W.D.N.C.1997) (quoting 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure:* Civil 2d § 2803 (1995)). In ruling on such a motion, the trial judge "may weigh the evidence and consider the credibility of the witnesses." *Poynter v. Ratcliff,* 874 F.2d 219, 223 (4th Cir.1989). Defendant contends that it is entitled to a new trial on the issue of liability because the jury's verdict is against the clear weight of the evidence. In addition, Defendant contends that it is entitled to a new trial on the issue of damages because the punitive damages awarded by the jury are excessive. For the reasons that follow the Court disagrees with Defendant's contentions.

1. *Defendant's Liability for Violation of Title IX*

■ In Defendant's Motion in the Alternative for a New Trial, Defendant argues that it is entitled to a new trial because the jury's finding with respect to "Duke's legitimate, non-discriminatory reasons for its conduct; actual notice and deliberate indifference; [and] the appropriateness ... of punitive damages" were against the clear weight of the evidence. (Def.'s Br. at 20.) The Court will first address the Defendant's liability for violating Title IX. Based upon the evidence presented, the Court finds that the jury had before it the following information upon which to support rendering a verdict in favor of Plaintiff: (1) Goldsmith made gender-biased comments towards Mercer; (2) Goldsmith treated Mercer differently with respect to her membership on the football team because she was a woman, particularly in light of the fact that he would not permit her to play on the scout team, would not permit her to stand on the sidelines during the home games with her teammates, would not issue her pads or a uniform, and created an inactive status solely for her; (3) President Keohane

and Athletic Director Butters had actual knowledge of Mercer's treatment while on the football team and of the fact that she was alleging discrimination based upon her gender; (4) Keohane and Butters failed to respond to or to investigate Mercer's allegation in a timely or reasonable manner aimed at uncovering and remedying any discriminatory conduct; and (5) Goldsmith's conduct towards Mercer was discriminatory and was based upon her gender in violation of Title IX. After considering the evidence and weighing the credibility of the witnesses, the Court concludes that the weight of the evidence supports the jury's verdict that the actions taken against Plaintiff were motivated because of her gender and that Defendant's officials were actually aware of and deliberately indifferent to Plaintiff's claim that Goldsmith was discriminating against her because of her gender. Moreover, the Court finds that there is no reason to believe that the jury's verdict was tainted or motivated by passion, sympathy, or prejudice, rather than by objective considerations. *See, e.g., Scagnelli v. Whiting,* 554 F.Supp. 77, 81–82 (M.D.N.C.1982) (explaining that a new trial is warranted where the jury has been improperly influenced by impermissible factors). To the extent that Defendant contends that the jury's finding of liability is against the clear weight of the evidence, Defendant's Motion for a New Trial is DENIED.

### 2. *Punitive Damages Award and Due Process*

■ Defendant also contends that it is entitled to a new trial because the jury's punitive damages award is unconstitutionally excessive. "In gauging excessiveness, [a court] must keep in mind the purpose of punitive damages: 'to punish the defendant and to deter him and others from [engaging in] similar conduct in the future.' " *Lee v. Edwards,* 101 F.3d 805, 809

(2d Cir.1996) (quotations omitted). "While great power is vested in a jury, the right of the jury to fix the amount of damages is not arbitrary or unlimited." *Filkins v. McAllister Bros., Inc.,* 695 F.Supp. 845, 851 (E.D.Va.1988). Specifically, a jury award cannot be so excessive as to violate due process. "[S]uch an award violates due process only when it can fairly be categorized as 'grossly excessive' in relation to [Congress's] legitimate interests in punishing unlawful conduct and deterring its repetition." *BMW of North Am., Inc. v. Gore,* 517 U.S. 559, 559, 116 S.Ct. 1589, 1591, 134 L.Ed.2d 809 (1996). There are three primary factors that a court should consider in evaluating an award of punitive damages: (1) the degree of reprehensibility of the conduct; (2) whether the amount of the exemplary award bears a reasonable relationship to the compensatory award; and (3) the difference between the award and the civil or criminal penalties authorized or imposed in like cases. *See id.* at 575, 116 S.Ct. at 1598.

#### a. *Degree of Reprehensibility*

■ "Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Id.* at 575, 116 S.Ct. at 1599. The evidence presented by Mercer demonstrated the nature and degree of Goldsmith's and Defendant's conduct towards her. Specifically, the jury had before it the following evidence to determine whether the reprehensibility of the alleged discriminatory conduct supported a substantial punitive damages award. First, Goldsmith continuously made adverse gender-based decisions with respect to Mercer's membership on the football team for a period of almost two years. Although officials with authority to take action to halt Goldsmith's behavior were aware of Mercer's

allegation of discrimination for a substantial portion of that two-year period, Defendant took no action to correct Goldsmith's conduct toward Mercer. Goldsmith's actions in denying Mercer a uniform and pads, in issuing a press statement claiming that Mercer would not be an active part of the football team, in requiring Mercer to leave the winter conditioning session for the 1997–1998 football season, in making gender-focused remarks to Mercer in reference to her status on the football team, and in precluding Mercer from even standing on the sidelines with the rest of the team during home games is purposefully conspicuous behavior that the jury could, indeed, have found to be reprehensible enough to justify a substantial punitive damages award under a *Gore* analysis. This is equally true to the extent that Defendant's flagrant disregard of the situation allowed these continuous and ongoing acts of discriminating and humiliating behavior to occur. The Supreme Court took such matters into account in *Gore* by noting that " '[t]he flagrancy of the misconduct is thought to be the primary consideration in determining the amount of punitive damages.' " *Id.* 116 S.Ct. at 1599 n. 23 (quoting David G. Owen, *A Punitive Damages Overview: Functions, Problems and Reform,* 39 Vill. L.Rev. 363, 387 (1994)). As will next be discussed, the jury, pursuant to *Gore,* also could have taken into account the negative effect of Defendant's conduct on Plaintiff's mental and emotional health in determining the reprehensibility of Defendant's conduct and its corresponding award of punitive damages.

b. *Disparity Between the Harm Inflicted and the Punitive Damages Award*

"The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." *Id.* at 580, 116 S.Ct. at 1601 (citing *TXO Prod. Corp. v. Alliance Res. Corp.,* 509 U.S. 443, 459, 113 S.Ct. 2711, 2721, 125 L.Ed.2d 366 (1993); *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 23, 111 S.Ct. 1032, 1046, 113 L.Ed.2d 1 (1991)). A comparison of the monetary value of the harm to the Plaintiff, however, cannot be the primary measure in determining whether an award of punitive damages is excessive. The Court "[has] consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award." *Id.* at 582, 116 S.Ct. at 1602 (citing *TXO,* 509 U.S. at 458, 113 S.Ct. at 2720). The Court has gone further to suggest that "low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages." *Id.* In addition, "[a] higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." *Id.* In this case, Plaintiff did not seek independent psychological counseling or professional help for Goldsmith's treatment of her, making the severity of her injury and the corresponding economic harm somewhat difficult to assess. However, contrary to Defendant's contentions, Plaintiff did present evidence during the trial that Duke's conduct affected her mental and psychological health. Specifically, Plaintiff presented evidence that she was constantly depressed, that she was unable to function normally on a daily basis, that she became extremely withdrawn, and that her personality drastically changed as a

result of her experience on the Duke football team. Moreover, this Court notes, contrary to Defendant's argument otherwise, that Plaintiff presented evidence that Goldsmith's discrimination against her was ongoing and unrelenting. In fact, Goldsmith's behavior towards Mercer extended over a substantial period of time. Each game that Goldsmith denied Mercer the opportunity to stand on the sidelines, each time that Goldsmith denied Mercer the opportunity to kick long-distance field goals when he allowed the other male place kickers to do so, each time Goldsmith made a gender-biased comment to Mercer, each practice and game that Mercer was precluded from getting a uniform or pads, and each practice session that Mercer remained on inactive status can all be viewed as separate instances of discrimination against and harm to Mercer. However, without any evidence of the monetary value of the mental anguish that Plaintiff experienced, the jury was left with little basis to award any more than nominal damages, such as the $1.00 it awarded as compensatory damages in this case. When the compensatory damages are compared to the $2,000,000 punitive damages award in this case, the ratio of 2,000,000 to 1, indeed, is enough to " 'raise a suspicious judicial eyebrow.' " *Id.* at 583, 116 S.Ct. at 1603 (quoting *TXO*, 509 U.S. at 481, 113 S.Ct. at 2732 (O'Connor, J., dissenting)). However, the use in this case of the ratio of the compensatory award to the punitive damages award is not an adequate measure of excessiveness, particularly in light of the fact that Plaintiff's non-economic harm was difficult for the jury to assess, given the unavailability of evidence in that regard. *See Lee*, 101 F.3d at 811; *Bristol Tech., Inc. v. Microsoft Corp.*, 114 F.Supp.2d 59, 88 (D.Conn.2000); *see generally Gore*, 517 U.S. at 582–83, @116 S.Ct. 1589, 134 L.Ed.2d 809. Unsurprisingly, "[b]ecause the compensatory award

here was nominal, *any* appreciable [punitive] award would produce a ratio that would appear excessive by this measure." *Lee*, 101 F.3d at 811. Given that the use of a multiplier "is not the best tool here" to assess punitive damages, the Court finds that a determination of the excessiveness of the punitive damage award would be more appropriately assessed by a comparison of the punitive damages award with the civil penalties that are available in a Title IX case, an approach that was used by the *Lee* and *Bristol* courts. *Bristol*, 114 F.Supp.2d at 89 (quoting *Lee*, 101 F.3d at 811).

### c. *Comparison of Available Civil Penalties*

Pursuant to Title IX, a federal fund recipient's failure to comply with any of the statute's requirements may result in "the termination of or refusal to grant or to continue assistance" to the violating entity. 20 U.S.C. § 1682. However, "such termination or refusal shall be limited to the particular political entity, or part thereof," to which a finding of discrimination has been made. *Id.* Given the statutory language, Defendant could have been subjected to penalties equaling the amount of federal funding distributed to the violating program. Because the Athletic Department was the violating program in this case, Defendant could have lost the federal funding to which the Athletic Department was previously entitled. Given this fact, the evidence presented during trial showed that the $2,000,000 punitive damages award paled in comparison to the amount of federal funding generally received by Defendant. It is only when the "penalties [for the] misconduct are much slighter than a punitive damages award" that the "tortfeasor [may be said to have] lacked 'fair notice' that the wrongful conduct could entail a substantial punitive award."

*Lee,* 101 F.3d at 811 (citing *Gore,* 517 U.S. at 584, 116 S.Ct. at 1589; *Patton v. TIC United Corp.,* 77 F.3d 1235, 1244 (10th Cir.1996), *cert. denied,* 518 U.S. 1005, 116 S.Ct. 2525, 135 L.Ed.2d 1049 (1996)). With an eye to the fair notice that Defendant had, based upon the statutory language of Title IX, that it could be subjected to substantial penalties for a Title IX violation, the Court next looks at the actual amount of federal funding received by Defendant and compares it with the actual penalty assessed against Defendant, to determine whether the punitive damages award was unconstitutionally excessive when compared to the federal funding amount, therefore depriving Defendant of fair notice.[11]

Although Plaintiff presented evidence that the University as a whole received approximately $200 million in federal funds for the 1997–1998 financial year, Plaintiff did not present any evidence as to the percentage of those funds allocated to the Athletic Department. Given the recognizable extent and magnitude of Duke's athletic programs, it is likely that the University expends a significant percentage of its financial resources on athletics. Even without a specific breakdown as to what portion of the federal funding was allocated to athletics, when compared against the larger sum, the punitive damages award in this case equates to only one percent of the federal funding received by the University in the 1997–1998 financial year. Although the Court will not speculate as to the total amount of federal funding received by Defendant during 1995 and 1997, the years in which Mercer's rights under Title IX were violated, the Court notes that it is likely that Defendant received, during that period, a similar amount to what it received during the 1997–1998 financial year. Given the potential amount of federal funding received in each fiscal year by Defendant, the Court finds that the University, even during 1995 and 1997, was on fair notice that a substantial financial penalty could have been assessed against it for a violation of Title IX. Accordingly, while a punitive damages award of $2,000,000 might be viewed as a substantial award, it is not excessive when viewed against the possibility that Duke could have lost a significant portion of its Title IX federal funding as a result of Goldsmith's conduct, funding that, in one year, amounted to $200,000,000.

### d. *Deterrence As Justification For Punitive Damages*

To the extent that Defendant still claims that the jury's verdict of $2,000,000 for punitive damages is excessive, the Court points again to *Gore* and the instruction it gives the Court in evaluating the excessiveness of the punitive damages award in this case. After considering the three factors set forth by *Gore,* the Court finds the

---

**11.** The Fourth Circuit's decision in *Litman v. George Mason University,* 186 F.3d 544, 551 (4th Cir.1999), is of particular note at this point. In *Litman,* the Fourth Circuit explained the quasi-contractual nature of Title IX as follows:

Section 1681(a), which precludes the use of Title IX federal education funds for discriminatory purposes, was enacted under the Spending Clause of the Constitution.... As a federal spending program, it operates 'much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions....' In other words, in exercising its spending power, the federal government 'conditions an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds.' *Id.* (citations omitted). Given Duke's agreement not to discriminate in return for its receipt of federal funds, Duke had fair notice that a substantial financial penalty could result from its failure to comply with Title IX's terms.

fundamental purpose cited by *Gore* for permitting punitive damages, that is, deterrence and prevention of repetition of conduct, to be a significant additional factor in this evaluation. Specifically, in assessing the excessiveness of the award, the Court affords great weight to the deterrent and preventative aspects of punitive damages. To the extent that the jury found that Defendant violated Title IX, given Defendant's considerable assets, as presented by Plaintiff's evidence,[12] the jury was permitted to take the financial status and size of the defendant into account "to ensure that the damage award [had] the [desired] deterrent effect on the defendant and others [similarly situated to the defendant]." *Bristol,* 114 F.Supp.2d at 80; *see also Gore,* 517 U.S. at 587, 116 S.Ct. at 1605; *Haslip,* 499 U.S. at 20–21, 111 S.Ct. at 1045 (both explaining the purposes of punitive damages). In sum, the $2,000,000 in punitive damages awarded to Plaintiff must be viewed in light of the purposes of such damages to determine whether the damages are excessive. It is highly possible that a more modest sanction, in light of all of the facts, would fail to achieve the desired result of punitive damages, that being to deter and prevent repetition of the conduct the jury found Defendant to have committed against Mercer. Accordingly, Defendant's Motion for a New Trial on the basis of the excessiveness of the punitive damages award is DENIED.

### 3. *Applicability of a Statutory Cap on Punitive Damages*

▪ Defendant next contends that it is entitled to a new trial on the damages issue because even if a substantial punitive damages award was warranted in this case, the award should be limited to $300,000. (Def.'s Br. at 17.) Defendant bases this argument on the fact that Title VII and other civil rights statutes impose such a cap on the total amount of compensatory and punitive damages that may be awarded for any given claim brought pursuant to those statutes. However, this Court does not agree that such a limitation is required in claims brought for a violation of Title IX. The general presumption, as noted by the *Franklin* Court, is that *all* remedies are available for violations of a federal statute, without limitation, unless Congress expressly directs otherwise. *Franklin,* 503 U.S. at 70–71, 112 S.Ct. at 1035. The general presumption does not apply in Title VII cases because "Title VII did not create a 'general right to sue' ... but instead specified a set of 'circumscribed remedies.'" *Tyler v. City of Manhattan,* 118 F.3d 1400, 1411 (10th Cir.1997) (quoting *Landgraf v. USI Film Prods.,* 511 U.S. 244, 285–86 n. 38, 114 S.Ct. 1483, 1508 n. 38, 128 L.Ed.2d 229 (1994) (citations omitted)). Unlike Title VII, Title IX does not specify or delineate the scope of the remedies available for its violation. Because Congress has not expressly directed otherwise, this Court concludes, pursuant to *Franklin,* that all remedies are available for violations of Title IX, without limitation, so long as those remedies do not exceed the constitutionally imposed limits. Therefore, Defendant's Motion for a New Trial, to the extent that it is based upon Defendant's argument that the punitive damages award is subject to a statutory cap of $300,000, is DENIED.

### C. *Motion for a Remittitur*

Finally, Defendant filed an additional Motion for Judgment as A Matter of Law based upon its request for a Remittitur of

---

**12.** Plaintiff's evidence revealed that Defendant's net assets in 1998 exceeded $3.4 billion. (Pl.'s Ex. 37).

the damages awarded by the jury to Plaintiff. To the extent that this Court has determined that the punitive damages award was not excessive and that a statutory cap on Title IX damages was not applicable, Defendant's Motion for a Remittitur is DENIED.

### D. *Motion for Attorneys' Fees*

Finally, Plaintiff has moved to recover attorneys' fees pursuant to 42 U.S.C. § 1988(b). Pursuant to § 1988(b), "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs . . . ." 42 U.S.C. § 1988(b). In this case, Plaintiff was the prevailing party, as that term is used in the statute, because she received a jury verdict for both compensatory and punitive damages on the merits of her gender discrimination claim.[13] Because Plaintiff is the prevailing party in this case, Plaintiff is entitled to receive a reasonable amount for attorneys' fees.

▮▮▮▮▮▮ In determining the amount of attorneys' fees to award, the Court must begin by calculating the lodestar amount for attorneys' fees. *See City of Burlington v. Dague*, 505 U.S. 557, 562, 112 S.Ct. 2638, 2641, 120 L.Ed.2d 449 (1992) (explaining that the lodestar figure is presumed to represent a reasonable fee). The lodestar figure is determined by multiplying the number of reasonable hours expended times a reasonable rate. *See Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983); *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 174–75 (4th Cir.1994). To determine the reasonable rate and reason-

able number of hours to be applied in calculating the lodestar, the Court is guided by the following twelve *"Johnson"* factors: (1) the time and labor required; (2) the novelty and difficulty of the questions presented; (3) the level of skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputations, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *See Rum Creek*, 31 F.3d at 175 (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974)).

Plaintiff has presented its fee request based on the *Johnson* factors and has calculated and seeks a total award of $340,939.50 for attorneys' fees and $47,860.33 for expenses. Defendant has advised the Court that it has reviewed the time and expenses submitted by Plaintiff's attorneys and has stipulated that both are reasonable. Defendant has also notified the Court that it will not oppose an award of fees at the aforementioned rates if the Court determines that Plaintiff is entitled to recover fees as a prevailing party. Having previously determined that Plaintiff is the prevailing party in this case and that Plaintiff is entitled to reasonable attorneys' fees, the Court will GRANT Plaintiff's Motion for Attorneys' Fees in the amount of $340,939.50 for fees, and the

---

**13.** Plaintiff also contends that she is the prevailing party because this Court has rendered a decision denying Defendant's post-trial motions in all respects. This Court agrees. *See Farrar v. Hobby*, 506 U.S. 103, 111–12, 113 S.Ct. 566, 573, 121 L.Ed.2d 494, 503–04 (1992) (explaining that a party is a prevailing party when "actual relief on the merits of [a party's] claim alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff").

amount of $47,860.33 for expenses, for a total award of $388,799.83.

### III. *CONCLUSION*

For the foregoing reasons, Defendant's Motion for Judgment as a Matter of Law, or in the Alternative, for a New Trial and/or a Remittitur [Document # 103], in all respects, is DENIED, and Plaintiff's Motion for Attorneys' Fees and Expenses [Document # 118] is GRANTED, in the total sum of $388,799.83.

An ORDER AND JUDGMENT consistent with this MEMORANDUM OPINION will be filed contemporaneously herewith.

### *ORDER AND JUDGMENT*

For the reasons set forth in the MEMORANDUM OPINION filed contemporaneously herewith, IT IS ORDERED, ADJUDGED, AND DECREED THAT Defendant Duke University's Motion for Judgment as a Matter of Law, or in the Alternative, for a New Trial and/or a Remittitur [Document # 103] is DENIED in all respects. In addition, Plaintiff Heather Sue Mercer's Motion for Attorneys' Fees [Document # 118] is GRANTED. IT IS FURTHER ORDERED that Defendant pay Plaintiff $388,799.83 in attorneys' fees and expenses.