Heather Sue MERCER, Plaintiff,

v.

DUKE UNIVERSITY, Defendant.

No. 1:97 CV 00959.

United States District Court, M.D. North Carolina.

Jan. 22, 2004.

Martha Melinda Lawrence, Burton Craige, Patterson, Harkavy & Lawrence, Raleigh, NC, for plaintiff.

John M. Simpson, Michelle C. Pardo, Caroline M. Mew, Fulbright & Jaworski, L.L.P., Washington, DC, for defendant.

## MEMORANDUM OPINION

BEATY, District Judge.

Currently before the Court is Plaintiff's Amended Motion for Award of Attorney's Fees [Document # 132], pursuant to which Plaintiff seeks to have the Court award attorney's fees. For the reasons stated below, Plaintiff's Amended Motion for Award of Attorney's Fees is GRANTED.

## I. FACTS AND PROCEDURAL HISTORY

In October 2000, this Court held a bifurcated jury trial on Plaintiff Heather Sue Mercer's ("Plaintiff" or "Mercer") claims of gender discrimination against Duke University ("Defendant" or "Duke") brought pursuant to Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. §§ 1681–1688.[1] Based upon the evidence presented at trial, the jury concluded that Coach Fred Goldsmith ("Goldsmith"), head coach of the Duke football team, had discriminated against Mercer on the basis of her gender and that Duke was liable for such discrimination under Title IX.[2] In a separate deliberation solely on the issue of damages, the jury awarded Mercer $1 in compensatory damages and $2,000,000 in punitive damages. Subsequently, Mercer filed a Motion for Attorney's Fees [Document # 118], which this Court considered in conjunction with Duke's Motion for Judgment as a Matter of Law, and its Alternative Motion for a New Trial and/or a Remittitur.

On March 12, 2001, this Court denied Duke's Motion for Judgment as a Matter of Law, and its Alternative Motion for a New Trial and/or a Remittitur, based upon the evidence that was presented to the jury during the trial. Specifically, the Court relied upon the following information to support the jury verdict rendered in favor of Mercer:

(1) Goldsmith made gender-biased comments towards Mercer; (2) Goldsmith treated Mercer differently with respect to her membership on the football team because she was a woman, particularly in light of the fact that he would not permit her to play on the scout team, would not permit her to stand on the sidelines during the home games with her teammates, would not issue her pads or a uniform, and created an inactive status solely for her; (3) [Duke University] President [Nan] Keohane and Athletic Director [Tom] Butters had actual knowledge of Mercer's treatment while on the football team and of the fact that she was alleging discrimination based upon her gender; (4) Keohane and Butters failed to respond to or to investigate Mercer's allegation in a timely or reasonable manner aimed at uncovering and remedying any discriminatory conduct; and (5) Goldsmith's conduct towards Mercer was discriminatory and was based upon her gender in violation of Title IX.

*Mercer v. Duke Univ.*, 181 F.Supp.2d 525, 547–48 (M.D.N.C.2001), *vacated in part and remanded per curiam*, 50 Fed. Appx. 643 (4th Cir.2002). The Court concluded that "the weight of the evidence supports the jury's verdict that the actions taken against [Mercer] were motivated because of her gender and that [Duke's] officials were actually aware of and deliberately indifferent to [Mercer's] claim that Goldsmith was discriminating against her because of her gender." *Id.* at 548. As a result of Duke's deliberate indifference, the Court upheld the jury's punitive damages award, *id.* at 548–49, 552, which the Court had previously determined was available as a remedy available under Title IX. *Id.* at 544–45.

---

**1.** For a complete recitation of the facts of Mercer's gender discrimination claims, see *Mercer v. Duke University*, 181 F.Supp.2d 525 (M.D.N.C.2001), *vacated in part and remanded per curiam*, 50 Fed. Appx. 643 (4th Cir.2002).

**2.** Title IX provides in pertinent part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a).

In its March 12, 2001 opinion, this Court also awarded Mercer, as the prevailing party, attorney's fees pursuant to 42 U.S.C. § 1988(b).[3] To determine the appropriate amount of attorney's fees, the Court calculated the lodestar amount, which is determined by multiplying the number of hours reasonably expended by a reasonable rate. *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983); *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 174–75 (4th Cir.1994). To determine the reasonable rate and the reasonable number of hours in order to calculate the lodestar amount, the Court relied upon the twelve *Johnson* factors: (1) the time and labor required; (2) the novelty and difficulty of the questions presented; (3) the level of skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputations, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *See Rum Creek Coal Sales*, 31 F.3d at 175 (citing *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974)). Because Mercer presented her fee request based on the *Johnson* factors and, after review, Duke stipulated to the Court that the time and expenses submitted by Mercer's attorneys were reasonable, the Court granted Mercer's Motion for Attorney's Fees in the amount of $340,939.50 for fees, and in the amount of $47,860.33 for

costs, for a total award of $388,799.83. *Mercer*, 181 F.Supp.2d at 553–54.

Duke appealed the award of punitive damages and attorney's fees and costs, but not the jury's finding of liability, to the United States Court of Appeals for the Fourth Circuit. On appeal, the Fourth Circuit vacated both the award of punitive damages and the award of attorney's fees and costs and remanded the case to this Court for reconsideration of the issue of attorney's fees and costs. *Mercer v. Duke Univ.*, 50 Fed. Appx. 643, 645–46 (4th Cir. 2002) (per curiam). Specifically, the Fourth Circuit found that punitive damages are not an available remedy under Title IX by relying upon the Supreme Court's decision in *Barnes v. Gorman*, 536 U.S. 181, 122 S.Ct. 2097, 153 L.Ed.2d 230 (2002). *See Mercer*, 50 Fed. Appx. at 644 (citing *Barnes*). In *Barnes*, the Supreme Court held that punitive damages are not available for private actions brought under Title VI of the Civil Rights Act of 1964 ("Title VI"). *Barnes*, 536 U.S. at 189, 122 S.Ct. at 2103. Because Title IX is modeled after Title VI and is interpreted and applied in the same manner as Title VI, the Fourth Circuit concluded that punitive damages were not available to Mercer under Title IX. *Mercer*, 50 Fed. Appx. at 644.

On appeal, after vacating the punitive damages award, the Fourth Circuit noted that Mercer was left with only one dollar in compensatory damages. *Id.* at 645. Duke argued that, under *Farrar v. Hobby*, 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992), Mercer's nominal-damages award standing alone was insufficient to support an award of attorney's fees and therefore requested the Fourth Circuit to vacate the fee award in its entirety. *See Mercer*, 50 Fed. Appx. at 645–46. While

---

**3.** 42 U.S.C. § 1988(b) states in pertinent part that "the court, in its discretion, may allow the prevailing party ... a reasonable attor-

ney's fee as part of the costs ...." 42 U.S.C. § 1988(b).

458

the Fourth Circuit ultimately did vacate Mercer's fee award, it disagreed with the notion that attorney's fees are never appropriate when a plaintiff only recovers a nominal-damages award. *See id.* at 646 (citing *Clark v. Sims,* 28 F.3d 420, 425 (4th Cir.1994)) (stating that "[the Fourth Circuit] ha[s] never interpreted *Farrar* as automatically precluding attorney's fee awards in all nominal-damage cases"). Accordingly, the Fourth Circuit held that whether Mercer should still receive an award of attorney's fees should be decided in the first instance by this Court. *Id.* In deciding to remand the question of attorney's fees to this Court, the Fourth Circuit first noted that " '[w]hen a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary relief, the only reasonable fee is usually no fee at all.' " *Id.* (alteration in original) (quoting *Farrar,* 506 U.S. at 115, 113 S.Ct. at 575 (citation omitted)). Nevertheless, the Fourth Circuit reiterated that *Farrar* does not automatically preclude attorney's-fee awards in all nominal-damages cases. *Id.* The Fourth Circuit further noted that "Mercer's claim against Duke was the first of its kind, and the jury's conclusion that Duke violated Title IX may serve as guidance for other schools facing similar issues." *Id.* The Fourth Circuit also offered Justice O'Connor's concurrence in *Farrar,* which explains that "the success of a plaintiff who recovers only nominal damages 'might be considered material if it also accomplished some public goal other than occupying the time and energy of counsel, court, and client.' " *Id.* (quoting *Farrar,* 506 U.S. at 121–22, 113 S.Ct. at 578 (O'Connor, J., concurring)). With the above guidance, the Fourth Circuit vacated the award of attorney's fees and remanded

the matter to this Court "for reconsideration, in light of Mercer's now limited success at trial, of the amount of attorney's fees, if any, that should be awarded . . . ." *Id.*

On January 21, 2003, Mercer filed an Amended Motion for Award of Attorney's Fees requesting an award of $437,622.97.[4] Notably, Mercer's attorneys adjusted the amount of attorney's fees previously requested by (1) reducing the previously stipulated fees by 3%, which Mercer contends reflects the percentage of time her attorneys spent at trial on damages ($340,939.50 × .97 = $330,711.31); (2) increasing the hourly rate for Mercer's attorneys from $195 to $250, a 28% increase, in accordance with an agreement made with Duke on January 7, 2003 ($330,711.31 × 1.28 = $423,310.47); and (3) adding 57.25 hours for the time Mercer's attorneys spent on the issue of fees in relation to their current Motion (57.25 hours × $250/hour = $14,312.50 + $423,310.47 = $437,622.97). The Court held a hearing on Mercer's Amended Motion for Attorney's Fees on May 20, 2003. The Court will now examine Mercer's request for attorney's fees based upon the remand of this matter to this Court for the purpose of determining whether the jury's award of nominal damages to Mercer is sufficient to support an award of attorney's fees.

## II. DISCUSSION

### A. Attorney's Fees in Nominal–Damages Cases

Notwithstanding Duke's argument regarding the untimeliness of Mercer's fee petition, which this Court summarily rejects, the main issue before this Court is the extent to which the Fourth Circuit's

---

4. After the Fourth Circuit's decision, Duke agreed to pay Mercer the amount of costs previously stipulated by the parties. (Mem. Supp. Pl.'s Am. Mot. Award Att'y's Fees at 2.) Accordingly, Mercer's present request for $437,622.97 only represents attorney's fees and not costs.

vacation of the jury's punitive damages award, thus leaving Mercer with only one dollar in compensatory damages, should affect the award of attorney's fees. Mercer asserts that because establishing Duke's liability was at "the heart of the case," she should receive attorney's fees reduced only by the proportion of time the parties devoted to the issue of damages. (Mem. Supp. Pl.'s Am. Mot. Award Att'y's Fees at 2.) Duke, on the other hand, maintains that Mercer should not receive any attorney's fees because Mercer's victory amounted to "nothing more than 'the moral satisfaction of knowing that a federal court concluded that [her] rights had been violated.' " (*Id.* at 7 (alteration in original) (emphasis omitted by Court) (quoting *Farrar*, 506 U.S. at 114, 113 S.Ct. at 574 (internal quotations omitted)).)

■ The Fourth Circuit, in its opinion vacating the punitive damages award, referred this Court to the United States Supreme Court's decision in *Farrar v. Hobby*, which examined the issue of awarding attorney's fees under 42 U.S.C. § 1988(b) in cases where a damages award is nominal. *Mercer*, 50 Fed. Appx. at 646 (citing *Farrar*). In *Farrar*, the Supreme Court held that "the most critical factor in determining the reasonableness of a fee award is the degree of success obtained." *Farrar*, 506 U.S. at 114, 113 S.Ct. at 574 (internal quotations omitted). In order to determine the degree of success Mercer achieved, the Court must "give primary consideration to the amount of damages awarded as compared to the amount sought." *Id.* (internal quotations omitted). In her concurring opinion in *Farrar*, Justice O'Connor expanded on the majority's reasoning and enunciated three factors a court must consider when determining a proper award of attorney's fees. First, as also stated in the majority opinion in *Farrar*, this Court must consider "[t]he difference between the amount recovered and the damages sought." *See id.* at 121, 113

S.Ct. at 578 (O'Connor, J., concurring). Second, this Court must analyze "the significance of the legal issue on which the plaintiff claims to have prevailed." *See id.* (O'Connor, J., concurring). Finally, as the Fourth Circuit highlighted, the third factor is whether Mercer's remaining damages award is material, which occurs " 'if it also accomplished some public goal other than occupying the time and energy of counsel, court, and client.' " *Mercer*, 50 Fed. Appx. at 646 (quoting *Farrar*, 506 U.S. at 121–22, 113 S.Ct. at 578 (O'Connor, J., concurring)). The Court will examine these three factors in depth.

1. Degree of Success Achieved by Mercer

■ As previously noted, the Court must inquire whether Mercer's nominal-damages award is purely technical or de minimis. This requires examining "the degree of success obtained," which is "the most critical factor in determining the reasonableness of a fee award." *Farrar*, 506 U.S. at 114, 113 S.Ct. at 574 (internal quotations omitted). In order to determine the degree of success Mercer achieved, the Court must give "primary consideration to the amount of damages awarded as compared to the amount sought." *Id.* at 114, 113 S.Ct. at 575 (internal quotations omitted). "Such a comparison promotes the court's central responsibility to make the assessment of what is a reasonable fee under the circumstances of the case." *Id.* at 114–15, 113 S.Ct. at 575 (internal quotations omitted).

As an initial matter, the Court notes that, based upon the limited evidence of damages offered by Mercer at trial, Mercer could only have expected to receive nominal compensatory damages because she did not offer any significant evidence related to compensatory damages at trial. In considering the trial itself, although

Mercer offered significant evidence that Duke discriminated against her and the jury found this evidence convincing, Mercer did not offer any evidence related to any physical or psychological harm she suffered as a result of the discrimination she experienced. Similarly, because Mercer was not the recipient of a football scholarship or any other monetary award related to her position on the football team, Mercer could not demonstrate that she was damaged so as to entitle her to a significant compensatory-damages award. Additionally, any claim for injunctive relief against Duke for its discriminatory conduct was mooted by Mercer's graduation from Duke in 1998. Accordingly, other than Mercer's attorney's request in his final argument to the jury asking the jury to award Mercer compensatory damages commensurate with the salary Duke continued to pay Goldsmith even after he was dismissed as Duke's head football coach, the Court must consider and examine the damages sought by Mercer in the context of the relatively limited evidence of damages Mercer was able to present at trial.[5]

The compensatory damages awarded, however, are not the only measure of Mercer's success at trial. At trial and even now, Mercer contends that her primary goal in pursuing her litigation against Duke was to obtain a determination that Duke was liable for the conduct of Coach Goldsmith. Because establishing Duke's liability for discrimination against her was her primary goal, Mercer contends that the jury's verdict against Duke demonstrates that she successfully achieved that goal. For that reason, Mercer argues that she should be awarded attorney's fees commensurate with the success she

achieved at trial based upon the jury's determination of the liability issue against Duke. To support her position, Mercer relies not only upon the record of the trial, with which the Court is familiar, but also upon the affidavits of several individuals who have extensively analyzed the importance and impact of Mercer's litigation against Duke on the role of women in intercollegiate athletics. Specifically, Mercer argues that she focused the majority of her efforts at trial on establishing Duke's liability. In doing so, the Court notes that Mercer called approximately twenty-three witnesses at the trial to testify regarding Duke's liability to her. Mercer's efforts culminated in a jury verdict that found that Goldsmith discriminated against her because she was a woman. The jury's verdict also signified that Duke officials knew of the allegations of discrimination and responded with deliberate indifference. Because the Court bifurcated the issue of damages, it was only after the jury's verdict regarding liability that Mercer's counsel addressed the issue of damages. It is significant to the question of Mercer's success at trial that, prior to even discussing damages, Mercer's attorney emphasized to the jury that "you have already given [Mercer] something that is more valuable than any amount of money and she is profoundly grateful for that and that's by your verdict." (Tr. Closing Arguments Damages at 2.) In comparison, a review of the trial transcript reveals that only 38 of the 1472 pages of trial testimony related to the issue of damages. The fact that the discussion of damages was limited demonstrates that Mercer's purpose in pursuing her claims was, at best, minimal-

---

5. Mercer's attorney did not suggest any particular figure that should be awarded to her for compensatory damages, but rather he stated the following to the jury:

Now in terms of the amount of damages, compensatory damages, I and Heather Sue

are not asking you for any particular amount. We trust the collective wisdom of this group and your life experiences.
(Tr. Closing Arguments Damages 12.)

ly motivated by a monetary damages award. Mercer's primary aim, as her counsel argued to the jury, was to obtain a finding of liability against Duke for discriminatory bias against her because she is a female. Plaintiff contends that the jury's verdict on the issue of liability, which has not been disturbed, demonstrates that she was wholeheartedly successful in that endeavor.

In response, Duke asserts that Mercer's victory was only a moral one because she sought "recompense, not institutional reform." (Mem. Law Supp. Def. Duke University's Opp. Pl.'s Am. Mot. Award Att'y's Fees at 9.) Duke contends that Mercer's counsel's closing arguments for both pecuniary and punitive damages, including a specific request that the jury award Mercer damages comparable to the value of her tuition and other expenses, signify that Mercer's primary focus was to obtain a financial recovery. In support of its position, Duke emphasizes that any time Mercer's attorneys spent at trial for the purpose of establishing Duke's liability for deliberate indifference as a form of discrimination against Mercer was also related to the question of whether Duke should be liable for punitive damages. Moreover, Duke asserts that Mercer's success at trial was de minimis because she sought compensatory and punitive damages from the jury but ultimately only received a nominal award of one dollar. The Court notes that the Fourth Circuit also recognized to some degree the limited success Mercer had at trial with its order to this Court to reconsider the award of attorney's fees "in light of Mercer's now limited success at trial." *Mercer*, 50 Fed. Appx. at 646. However, the Fourth Circuit did not find that Mercer's success was de minimis, particularly with respect to the jury's verdict on liability, but the Fourth Circuit merely acknowledged that, in light of its ruling that Mercer was not entitled to·punitive damages, she was left with limited success at trial with respect to her requests to the jury for compensatory and punitive damages.

Therefore, given the Court's view that Mercer's main focus at trial was to establish liability against Duke on the basis of Duke's deliberate indifference to her claims of discrimination, the Court finds that Plaintiff's degree of success must be viewed in the context of the jury's finding that Duke was deliberately indifferent to Mercer's claims of discrimination on the basis of her gender. Thus, because the primary purpose of Mercer's litigation was to establish that Duke violated her rights, her degree of success cannot be judged solely by the nominal monetary compensation she was awarded. *See Lucas v. Guyton*, 901 F.Supp. 1047, 1053 (D.S.C.1995) (awarding reasonable attorney's fees to a plaintiff who recovered only nominal damages and evaluating his degree of success under *Farrar* in light of the fact that the primary relief he sought was a determination that the defendants had violated his constitutional rights). Accordingly, in the absence of any significant evidence of damages, the remedy that Mercer could most realistically seek through her litigation was a judgment finding Duke·liable for discrimination on the basis of sex in violation of Title IX.[6] Because Mercer achieved the primary result that she sought, the Court finds that the degree of success she achieved was not de minimis. Mercer's litigation vindicated her personal right, as well as the rights of others, to be free from

---

**6.** Because there was such little evidence presented on the issue of damages, the Court in establishing a time limit on the final arguments gave each party forty-five minutes on the "main portion" of their arguments, that is, the liability question, and further limited each party to only fifteen minutes with respect to the question of damages. (Trial Tr. of 10/12/00 at 16, 50.)

discrimination on the basis of gender in accordance with Title IX.

2. Significance of the Legal Issue on Which Mercer Claims to Have Prevailed

The latter statement, which addresses discrimination in the form of gender bias, generally leads into the second factor the Court must examine, which is "the significance of the legal issue on which the plaintiff claims to have prevailed." *Farrar*, 506 U.S. at 121, 113 S.Ct. at 578 (O'Connor, J., concurring). While this factor is usually "the least weighty in classifying the victory," *Cartwright v. Stamper*, 7 F.3d 106, 110 (7th Cir.1993), it also remains largely undefined in case law. Some courts have interpreted the significance of the legal issue as relating to whether the claim is "a novel and difficult claim that vindicated an important constitutional right." *See, e.g., Hall v. Lowder Realty Co.*, 263 F.Supp.2d 1352, 1363 (M.D.Ala.2003). Other courts, however, have simply applied discretionary principles to decide whether the issues presented were legally significant. *See, e.g., Murray v. City of Onawa, Iowa*, 323 F.3d 616, 619 (8th Cir.2003) ("[W]e believe compelling city officials to make at least cursory investigations into serious allegations of police abuse and misconduct are [sic] significant legal issues.").

In support of her position that her victory advanced a significant legal issue, Mercer provided the Court with affidavits of various legal practitioners who expressed opinions as to the importance of her lawsuit. For example, Stewart W. Fisher, a partner in the law firm of Glenn, Mills & Fisher, P.A., who closely followed this case, noted that "[g]iven the novel issues presented by this case and undeveloped state of the law in this area, this was a real victory for the rights of female athletes, and for all women in male-dominated fields." (Fisher Supp. Aff. ¶ 7.) Similarly, other affidavits, including those from

James E. Ferguson, II, and Robert M. Elliot, assert that Mercer's case was not only "without precedent," but also vindicated her right, and the rights of others, to be free from discrimination on the basis of gender at federally funded educational institutions. (Ferguson Supp. Aff. ¶¶ 3–4; Elliot Aff. ¶ 3.) In response, while Duke asserts that the significance of Mercer's legal victory is merely "pyrrhic" and of little legal significance, the Court finds, however, that Mercer's victory did indeed advance a novel and significant legal issue, that is, whether Title IX prohibits gender discrimination when a female athlete is permitted to try out for a traditionally male contact-sports team.

3. Public Goal

As the Fourth Circuit noted, the third factor used to determine whether Mercer's lawsuit justifies an award of attorney's fees is whether Mercer's success at trial on the issue of Duke's liability is material, which may exist " 'if it also accomplished some public goal other than occupying the time and energy of counsel, court, and client.' " *Mercer*, 50 Fed. Appx. at 646 (quoting *Farrar*, 506 U.S. at 121–22, 113 S.Ct. at 578 (O'Connor, J., concurring)). Specifically, *Farrar* "suggested a more general proportionality consideration as well: whether the public purposes served by resolving the dispute justifies [sic] the recovery of fees." *Sheppard v. Riverview Nursing Ctr., Inc.*, 88 F.3d 1332, 1336 (4th Cir.1996) (citing *Farrar*, 506 U.S. at 121–22, 113 S.Ct. at 578 (O'Connor, J., concurring)).

As for the third factor, which as already noted is the accomplishment of a public goal "other than occupying the time and energy of counsel, court, and client," *Farrar*, 506 U.S. at 121–22, 113 S.Ct. at 578 (O'Connor, J., concurring), again, there has been different treatment of this issue in

different courts. Some courts appear to read the factor as requiring a more compelling showing of the public good that is being advanced. *See, e.g., Pino v. Locascio*, 101 F.3d 235, 239 (2d Cir.1996) (noting that "not every tangential ramification of civil rights litigation *ipso facto* confers a benefit on society"); *see also id.* (concluding that a public purpose was served in *Cabrera v. Jakabovitz*, 24 F.3d 372 (2d Cir.1994), but only because the plaintiff in that case prevailed on a "novel issue of law"); *Maul v. Constan*, 23 F.3d 143, 146 (7th Cir.1994) (concluding that a public purpose was not served because the "[p]laintiff brought suit only on his own behalf, alleging only violations of his own rights" and seeking redress for his injuries only). Other courts, however, have looked at the third factor in more generous terms, concluding that a public goal is accomplished if the plaintiff's victory encourages attorneys to represent civil rights litigants, affirms an important right, puts the defendant on notice that it needs to improve, or provokes a change in the defendant's conduct. *See, e.g., O'Connor v. Huard*, 117 F.3d 12, 18 (1st Cir.1997) (noting that the plaintiff's victory was not de minimis because, among other things, it provided an incentive to attorneys to represent civil rights litigants such as the plaintiff and it served as a deterrent to future abuses); *Muhammad v. Lockhart*, 104 F.3d 1069, 1070 (8th Cir.1997) (stating that the verdict in favor of the plaintiff "accomplished a public goal, namely, encouraging governments scrupulously to perform their constitutional duties"); *Piper v. Oliver*, 69 F.3d 875, 877 (8th Cir.1995) (upholding the district court's award of attorney's fees where the district court found, in part, that "a public goal had been served by [the plaintiff's] victory in encouraging [the defendants] to refashion their forfeiture procedures to avoid future illegality"); *Wilcox v. City of Reno*, 42 F.3d 550, 555 (9th Cir.1994) (concluding that a public purpose would be served if the plaintiff's suit "achieved ... tangible results ... such as sparking a change in policy or establishing a finding of fact with potential collateral estoppel effects"); *Jones v. Lockhart*, 29 F.3d 422, 424 (8th Cir.1994) (noting that, in general, "civil rights litigation serves an important public purpose" because "[a] plaintiff bringing a civil rights action does so not for himself alone but also as a private attorney general, vindicating a policy that Congress considered of the highest priority") (internal quotations omitted); *Cartwright*, 7 F.3d at 110 (noting that a public purpose is more likely served "[t]he more important the right at stake and the more egregious the violation" and also suggesting that a public purpose would be served if the plaintiff's victory had "external benefits or [a] future deterrent effect") (internal quotations omitted); *Lucas*, 901 F.Supp. at 1055 (concluding that a public purpose was served by "provid[ing] an incentive for competent and skilled attorneys to take on unpopular cases and indigent clients thereby acting as a private attorney general") (internal quotations omitted). Notably, the Fourth Circuit has not examined this issue in depth.

To support her position that her lawsuit advanced a public goal, Mercer suggests that her lawsuit expanded the reach of Title IX and brought national attention to women's intercollegiate athletics. Furthermore, she offers declarations from Nancy Hogshead–Makar, an Olympic gold medal winner and law professor who attended Duke, and Donna Lopiano, the Executive Director of the Women's Sports Foundation. Mrs. Hogshead–Makar asserts that Mercer's lawsuit will permit female athletes "to rely on [her] case to induce their schools to provide them with equal treatment." (Hogshead–Makar Decl. ¶ 10.) She also added that because of her litigation, Mercer "forced all schools to think about how they may be limiting

educational opportunities based on gender stereotypes." (*Id.* ¶ 13.) Ms. Lopiano also recognized that Mercer's "victory advanced the purposes of Title IX, and helped secure equal treatment for thousands of other women." (Lopiano Decl. ¶ 11.)

In response, Duke focuses its argument on its position that Mercer's victory did not advance a public goal but was actually a setback to women in intercollegiate athletics. Specifically, Duke contends that Mercer's lawsuit did not help to promote gender equality on traditionally male athletic teams. Rather, Duke contends that Mercer's lawsuit actually devalued Title IX by chilling future opportunities for female athletes on men's contact-sports teams. However, this case was not about whether Title IX permitted female athletes to participate in men's contact sports. It clearly does not. Rather, the case was about whether a female athlete may be subjected to gender discrimination once a college institution allows her to participate on a men's contact-sports team.

Nevertheless, in support of its position that Mercer's victory adversely affected the protection of Title IX to other female athletes, Duke provided the Court with several newspaper articles and editorials that criticize the jury's verdict and the courts' rulings. However, the Court finds such articles unpersuasive for two reasons. First, many of the articles do not focus on the protections afforded by Title IX to women who try out for male contact-sports teams after Mercer's victory, but instead engage in personal attacks on Mercer and her abilities as a kicker. *See, e.g.,* Mitch Alborn, *Ruling Might Throw Women for a Loss,* L.A. Bus. J., Nov. 27, 2000, at 57, 2000 WL 27194627 ("Mercer never got to play—or even dress for games—and the following season she was cut. The reason given was simple: She wasn't a good enough kicker."); Diane Pucin, *Verdict Is Kick in the Pants,* L.A. Times, Oct. 20, 2000, at D1, 2000 WL 25909393 ("Mercer wasn't a typical walk-on. Typical walk-ons don't bring their mother into the coach's office, then have to tell mom to quit yelling at the coach."). The opinions expressed by these columnists do not weigh significantly in either direction on the question of whether Mercer's victory in the case against Duke advanced a public goal. Specifically, the articles cited by Duke fail to examine the effect of Title IX on women who, after Mercer's lawsuit, may be permitted to try out for men's contact-sports teams. Secondly, the focus of some of the articles is whether football is a sport in which women should be permitted to play at all. *See, e.g.,* Mark Kiszla, *No Place for Women in Football,* Denver Post, Oct. 17, 2000, at D1, 2000 WL 25831395 ("Putting a woman in football cleats as a cheap publicity stunt is a dangerous game."). The Court notes again, however, that the scope of Mercer's lawsuit did not involve the question of whether women should be permitted to play football or any other men's contact sport, but rather, if they are permitted to engage in such sports, then what level of protection against discrimination Title IX affords them.

Contrary to Duke's arguments that after Mercer's lawsuit women will not be permitted in the future to try out for men's contact-sports teams, the Court notes that several college football coaches are quoted in the articles proffered by Duke, including Rick Neuheisel, the former head football coach at the University of Washington, as supporting any female football player who is qualified. *See* Rachel Alexander, *A Kicker Sees Her Chance Blocked; Recent Court Ruling Could Deter Coaches,* Wash. Post, Oct. 22, 2000, at A1, 2000 WL 25423848. According to Neuheisel, "If a girl is qualified, and she can go out there and enjoy, then why not?" *Id.* Similarly, according to Gene Murphy, football coach

at Fullerton College, "I don't think there's a football coach in the country, at any level, who wouldn't keep a player good enough to help him win." Pucin, *supra.* Accordingly; the Court finds that the evidence proffered by Duke does not address whether Mercer's litigation achieved a public goal, especially here where the focus of Mercer's litigation was whether Title IX should apply to the treatment of women athletes who are permitted to try out for men's contact-sports teams.

Notwithstanding Duke's position, the Court finds that Mercer achieved two important goals throughout the course of her litigation against Duke. First, Mercer brought a case of first impression that led the Fourth Circuit to specifically recognize that a cause of action would exist under Title IX when an educational institution that receives federal funds discriminates on the basis of sex against women who are permitted to try out for a previously all-male contact-sports team. *Mercer v. Duke Univ.*, 190 F.3d 643 (4th Cir.1999). As the court of appeals noted in its decision remanding the question of attorney's fees to this Court, "Mercer's claim against Duke was the first of its kind, and the jury's conclusion that Duke violated Title IX may serve as guidance for other schools facing similar issues." *Mercer*, 50 Fed. Appx. at 646. Second, Mercer achieved a not-so-easily-obtainable victory when the jury found that Duke, as an institution, acted with deliberate indifference to Mercer's allegations of discrimination on the basis of her sex. Moreover, the Court finds that Mercer furthered a public goal by bringing much national attention to Title IX's objective of combating sex discrimination in federally funded educational institutions. The Court also finds merit to Jocelyn Samuels' declaration that "[d]enying Mercer adequate fees would undermine such efforts to enforce Title IX because individuals are unlikely to seek to vindicate their rights if they have to secure monetary damages in addition to a judgment of liability in order to be compensated for attorneys' fees." (Samuels Decl. ¶ 8.). Finally, even though Duke contends that, as a result of Mercer's lawsuit, coaches will be less likely to permit female athletes to try out for traditionally male contact-sports teams; the Court finds this argument to be unpersuasive because Title IX does not require that such permission be granted, but rather Title IX does apply to female athletes who are given the opportunity to try out for men's contact-sports teams. Therefore, the lesson to be learned from Mercer's lawsuit is that female athletes who are permitted to try out for a men's contact-sports team at a federally funded institution are entitled to the same rights as their male counterparts to be free from discrimination on the basis of gender. Simply put, this case prohibits discrimination, but does not afford female athletes any special protections or opportunities. If a female athlete does not have the skill or talent necessary to compete on the team, then this case does not force coaches to make special exceptions or accommodations for the female athlete. Instead, it protects female athletes who are extended the opportunity to try out for a men's contact-sports team from being discriminated against on the basis of gender.

After applying the standard established by Justice O'Connor in her concurrence in *Farrar*, the Court finds that Mercer's lawsuit did indeed vindicate her rights with regard to a significant legal issue while at the same time it also advanced an important public goal. Mercer achieved her primary goal of establishing Duke's liability under Title IX. Mercer's success therefore also added value to the development of Title IX jurisprudence and the public goal she sought to achieve. Furthermore, as a result of Mercer's lawsuit, educational institutions are put on notice that behavior and practices that violate Title IX

are unacceptable. Further, this litigation will also reiterate to educational institutions the importance of investigating students' claims of discrimination and the importance of informing their faculties that sexual discrimination under Title IX is a serious violation of public policy. *See Brandau v. Kansas,* 168 F.3d 1179, 1182–83 (10th Cir.1999) (upholding the district court's award of attorney's fees where the district court found both that "[a]s result of this case, defendant is on notice that it must educate its employees about sexual harassment in the workplace and must promptly investigate any such claims," and that "while Plaintiff's litigation did not achieve significant monetary benefits, it served a larger public purpose") (alteration in original) (internal quotations omitted).

For the foregoing reasons, therefore, the Court finds that an award of attorney's fees is supported by the rationale of *Farrar* and Justice O'Connor's three-part test. Furthermore, because this Court finds that Mercer's successful litigation against Duke cannot be viewed as de minimis or pyrrhic, the Court finds that Plaintiff is entitled to a fee greater than a low fee or no fee.

### B. Amount of Attorney's Fees

■ Because the Court finds that Plaintiff is entitled to an award of reasonable attorney's fees, it must now determine the appropriate award. The Court has the discretion to determine the amount of a fee award. *Hensley v. Eckerhart,* 461 U.S. 424, 436–37, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983). Mercer's counsel has requested an award of attorney's fees in the amount of $437,622.97. This amount includes $423,310.47 of attorney's fees related solely to time spent establishing Duke's liability for discrimination, which represents the original fee award of $340,939.50 reduced by 3%, which Mercer contends is the amount of time spent at

trial litigating the issue of damages, and then increased by the 28% increase in the hourly fee from $195 to $250, the hourly fee that Duke has stipulated is reasonable ($340,939.50 × 97% = $330,711.31 × 1.28 = $423,310.47). Mercer's fee request of $437,622.97 also includes $14,312.50 for fees incurred in preparing the current fee petition, which the Court will address in Section II.C. In summary, therefore, Mercer has requested a total award of attorney's fees of $437,622.97 ($423,310.47 + $14,312.50 = $437,622.97).

To determine the appropriate award of attorney's fees in a case in which the plaintiff receives a nominal-damages award, the Fourth Circuit has relied upon the process outlined by the Supreme Court in *Hensley. See Johnson v. City of Aiken,* 278 F.3d 333, 336–37 (4th Cir.2002) (citing *Hensley* ). In *Hensley,* the plaintiffs asserted several constitutional claims and eventually prevailed on most, but not all, of the claims. *Hensley,* 461 U.S. at 427–28, 103 S.Ct. at 1936. The district court in *Hensley* awarded fees under 42 U.S.C. § 1988(b), but it refused to reduce the award of fees by the hours spent on unsuccessful claims. *Id.* at 428, 103 S.Ct. at 1937. After the Eighth Circuit affirmed the district court's ruling, the Supreme Court vacated the award and remanded for reconsideration of the amount to be awarded. *Id.* at 440, 103 S.Ct. at 1933. The Supreme Court explained that a § 1988 award should reimburse the plaintiff for work "expended in pursuit of" the success achieved. *Id.* at 435, 103 S.Ct. at 1943 (internal quotations omitted). To determine the appropriate amount of a fee award, the district court should first identify "the number of hours reasonably expended on the litigation" and multiply that number "by a reasonable rate." *Id.* at 433, 103 S.Ct. at 1939. The court should then subtract fees for hours spent on unsuccessful claims unrelated to successful

ones. *Id.* at 435, 103 S.Ct. at 1940. Once the court has subtracted fees incurred for unsuccessful, unrelated claims, it then awards some percentage of the remaining amount, depending upon the degree of success achieved by the plaintiff. *Id.*

Here, the Court originally awarded Mercer a total of $340,939.50 in attorney's fees, as stipulated to by Duke, which represented 1684.65 hours spent by her attorneys, 217.40 hours spent by paralegals, and 14.60 hours spent by a law student. The Court first notes that Duke has stipulated that the total hours spent by Mercer's attorneys are reasonable. Moreover, Duke has also stipulated that an increase in the hourly rate from $195 to $250 per hour is reasonable. Therefore, as discussed above, Mercer requests an attorney's fee of $423,310.47 for time spent litigating the issue of Duke's liability, calculated as follows: $340,939.50 × 97% = $330,711.31 × 1.28 = $423,310.47.

The Court, in its discretion, declines to adopt Mercer's calculation of attorney's fees. The Court believes that the appropriate starting point for a calculation of the fee award is the stipulated hours times the stipulated hourly rates. Therefore, under the Court's approach, the fees related to the time spent by Mercer's attorneys are $421,162.50 (1684.65 hrs. × $250/hr.), the fees related to paralegals are $13,044.00 (217.40 hrs. × $60/hr.), and the fees related to the law student are $1095 (14.60 hrs. × $75/hr.), which total $435,301.50. Having determined an appropriate total amount of fees based upon Duke's stipulation to the hours and hourly rates claimed by Mercer's attorneys, the Court must next subtract fees for hours spent on unsuccessful issues unrelated to successful ones. In this case, because Mercer was unsuccessful on the issue of damages, the Court must deduct fees related to any time Mercer's attorneys spent solely on the issue of damages. Mercer's attorneys contend, and Duke does not dispute, that 3% of the time spent litigating this case related solely to the issue of damages. Accordingly, the Court will reduce the amount of fees, previously determined to be $435,301.50, by 3%, or $13,059.05, such that the total fees for time spent litigating successful issues related to unsuccessful issues is $422,242.45.

The Court's calculation therefore differs in several respects from the calculation advocated by Plaintiff's attorneys. First, Plaintiff's attorneys base their calculation on the original fee award of $340,939.50. In their papers submitted in support of the original Motion for Attorney's Fees [Document # 118], Mercer's attorneys stated that their hourly rate was $195, the hourly rate for their paralegals was $60, and the hourly rate for a law student was $75. When calculated separately, the total fees for attorneys amounted to $328,506.75 (1684.65 hrs. × $195/hr.), paralegals amounted to $13,044 (217.40 hrs. × $60/hr.), and the law student amounted to $1095 (14.60 hrs. × $75/hr.), for a total of $342,645.75. Nevertheless, Mercer's attorneys previously only requested $340,939.50 in fees, which was the total amount awarded by the Court. Therefore, the Court cannot reconcile the original award of $340,939.50 with the amount the Court has now calculated based upon the hours spent times the relevant hourly rates then in effect. Thus, the original award of $340,939.50 is not an appropriate starting point for calculating Mercer's attorney's-fee award.

Second, to calculate the effect of the 28% increase in the hourly rate for attorney time from $195 to $250, Mercer's calculation increases the entire fee award by 28%. Thus, while Plaintiff's calculation properly increases the hourly rate for her attorneys from $195 to $250, it also effectively increases the hourly rates for para-

legals and the law student by 28%. Duke, however, has not stipulated to increases in the hourly rates for paralegals or the law student, and the Court finds such increases unwarranted. For this reason, the Court. has calculated the fee award by simply multiplying the stipulated hours for attorneys, paralegals, and the law student by the current stipulated hourly rates, rather than applying an across-the-board rate increase of 28%.

Third, while Mercer's attorneys concede that this Court must reduce their fees by 3%, their calculation of attorney's fees applies this reduction to the original award. As discussed above, this Court has made its calculation based on the stipulated hours multiplied by the current stipulated hourly rates. Therefore, because the Court is not basing its calculation on the original award of $340,939.50, the Court applies the 3% reduction after calculating the revised fee award of $435,301.50. For the foregoing reasons, therefore, after applying the new hourly rate for Mercer's attorneys and after reducing Mercer's fees by 3% for time spent solely on the issue of damages, the Court has calculated a total fee of $422,242.45 for time spent litigating successful issues related to unsuccessful issues.

Having eliminated from Mercer's fee award time spent solely on the unsuccessful claims for compensatory and punitive damages, the Court must now examine Mercer's overall degree of success to determine what percentage of the remaining amount of fees should be awarded. As the Supreme Court noted in *Hensley*, "[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." *Hensley*, 461 U.S. at 435, 103 S.Ct. at 1940. The Supreme Court further reasoned that "[n]ormally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award

may be justified. In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." *Id.* Nevertheless, "the most critical factor is the degree of success obtained." *Id.* at 436, 103 S.Ct. at 1941. As already noted, this Court finds that Mercer achieved her primary goal when she obtained a jury verdict that found Duke was not only liable for gender discrimination in violation of Title IX, but also that it was deliberately indifferent to her claims of discrimination. Because Mercer could not demonstrate to the jury that she was entitled to compensatory damages and furthermore because her award of punitive damages has now been vacated, the Court must conclude that Mercer was not fully successful in achieving every aspect of her claims against Duke. The Fourth Circuit likewise has deemed Mercer to have achieved limited success. *See Mercer*, 50 Fed. Appx. at 646. As discussed more fully above, however, the court of appeals' description of Mercer's success at trial does not appear to foreclose this Court from awarding Mercer reasonable attorney's fees. While recognizing, as it must, that Mercer was not fully successful, the Court has found that the results Mercer achieved were not so de minimis as to require an award of low or no attorney's fees. Instead, even taking into account Mercer's failure to obtain more than a nominal monetary award for compensatory damages, the Court, for the reasons discussed above, finds that Mercer is entitled to receive a reasonable award of attorney's fees. There is no question that Mercer achieved "excellent results" with respect to the liability portion of her litigation. These "excellent results" are demonstrated by the jury's finding that Duke was deliberately indifferent to Mercer's claims of discrimination, and by the fact that Duke did not contest the liability issue in its appeal to the Fourth

Circuit. This Court, however, must weigh and compare Mercer's degree of success on the liability question to her limited success on damages. Having done so, the Court, in its discretion, believes that a twenty percent (20%) reduction for Mercer's overall lack of success properly balances Mercer's lack of success on damages with both her success in finding Duke deliberately indifferent to her claims of discrimination and the public good she achieved by sending a message to other institutions that violations of Title IX will not be tolerated. Given the Court's recognition that a twenty percent (20%) reduction is warranted based on the unsuccessful efforts of Mercer's litigation, the Court finds that the attorney's fees previously calculated by the Court in the amount of $422,242.45 should therefore be reduced by $84,448.49, resulting in a fee of $337,793.96. In summary, therefore, the Court finds that Mercer is entitled to recover from Duke a reasonable attorney's fee of $337,793.96.

### C. Mercer's Additional Request for Fees–on–Fees

■ As mentioned above, also included in Mercer's Amended Motion for Attorney's Fees is a request for an additional $14,312.50 (57.25 hrs. × $250/hr.) for litigating the issue of attorney's fees, also known as "fees-on-fees." Duke contends that Mercer's attorneys are not entitled to a "fees-on-fees" award because they failed to reasonably negotiate with Duke regarding the attorney's-fee issue. Duke asserts that it made several concessions when it negotiated with Mercer's attorneys regarding fees, including the fact that Duke agreed to pay the litigation costs, and the fact that it did not dispute the number of hours Mercer's attorneys claimed to have spent on the litigation generally. Duke also argues that fees-on-fees should not be awarded as additional damages because it did not dispute the hourly billing rate, or

the increase in the billing rate which Mercer's attorneys requested. Duke further contends that Mercer's attorneys ignored its attempts to negotiate and, as a result, should not be permitted to recover for the time they spent litigating the issue of attorney's fees.

In response, Mercer's attorneys refer the Court to a letter sent by David Adcock, Duke's General Counsel, to Mr. Jonathan Harkavy, which states that Duke viewed "the uppermost limit of [its] exposure" at $110,000, and that only if Mercer's attorneys were willing to "negotiate within this framework, [would] further discussions ... be productive." (See Mem. Law Supp. Def. Duke University's Opp. Pl.'s Am. Mot. Award Att'y's Fees, Exh. 9 at 1–2.) Mercer's attorneys argue that their legal fees were far in excess of $110,000 and that the law does not require them to capitulate to Duke's demands. For these reasons, therefore, Mercer's attorneys decided to seek judicial intervention before this Court on the entire issue of attorney's fees.

The Court first notes that the Fourth Circuit has specifically held that fees-on-fees are available to prevailing parties under § 1988. See *Trimper v. City of Norfolk, Va.*, 58 F.3d 68, 77 (4th Cir.1995) (citing *Daly v. Hill*, 790 F.2d 1071, 1080 (4th Cir.1986)) (holding that "it is well settled that the time spent defending entitlement to attorney's fees is properly compensable under § 1988"). While this Court can locate no Fourth Circuit authority specifically applying *Hensley* to requests for fees-on-fees, the Fourth Circuit has held that the determination of an appropriate award of fees-on-fees is within the district court's discretion. See *id.*; *Daly v. Hill*, 790 F.2d 1071, 1080 (4th Cir.1986). Further, other circuits have held that *Hensley* applies to requests for fees-on-fees. See, e.g., *Thompson v. Go-*

*mez*, 45 F.3d 1365, 1367 (9th Cir.1995); *In re Burlington N., Inc., Employment Practices Litig.*, 832 F.2d 430, 434 (7th Cir. 1987); *Institutionalized Juveniles v. Sec'y of Pub. Welfare*, 758 F.2d 897, 924 (3d Cir.1985). As guidance on the issue of fees-on-fees, the Supreme Court has stated that "[b]ecause *Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983), requires the district court to consider the relationship between the amount of the fee awarded and the results obtained, fees for fee litigation should be excluded to the extent that the applicant ultimately fails to prevail in such litigation." *Comm'r, INS v. Jean*, 496 U.S. 154, 163 n. 10, 110 S.Ct. 2316, 2321 n. 10, 110 L.Ed.2d 134 (1990). In response to *Hensley*, courts have reduced the fees-on-fees request by the same percentage as the attorney's fees awarded. For example, in *Harris v. McCarthy*, 790 F.2d 753 (9th Cir.1986), the Ninth Circuit noted that the district court awarded the plaintiffs 11.5% of the attorney's fees requested, and then simply applied that percentage to the plaintiffs' request for fees-on-fees. *Id.* at 758–59. The Ninth Circuit found that the district court did not abuse its discretion and appropriately applied the same assessment of the results obtained in the litigation to the determination of a reasonable fee. *Id.* at 759. Moreover, while the Supreme Court in *Hensley* advocates that the "litigants ... settle the amount of a fee," *Hensley*, 461 U.S. at 437, 103 S.Ct. at 1941, the Court does not believe that Mercer should be denied fees-on-fees merely because the parties' fee negotiations broke down. Relying on the approach promulgated by the Ninth Circuit, this Court finds it appropriate to adjust Mercer's request of $14,312.50 for fees-on-fees by reducing it by 20%, which represents the same percentage reduction the Court applied to Mercer's general fee request due to Mercer's lack of overall success against Duke.

The Court also notes that Duke contends that the 57.25 hours Mercer's attorneys spent in their request for attorney's fees are "inordinate." The Court, however, has reviewed the affidavits of Plaintiff's attorneys supporting the request for fees-on-fees and finds that Plaintiff's attorneys have not devoted an inordinate amount of time to litigating this issue. Therefore, in light of the 20% reduction the Court has applied to Plaintiff's request for fees-on-fees due to Plaintiff's overall lack of success in her Amended Motion for Award of Attorney's Fees, the Court believes that the reduced fees-on-fees award of $11,450.00 is appropriate.

For the foregoing reasons, therefore, the Court hereby awards Mercer total attorney's fees of $349,243.96, which are comprised of $337,793.96 in attorney's fees for litigating her Title IX claims against Duke plus an additional $11,450.00 in fees for pursuing the additional fee litigation before this Court.

## III. CONCLUSION

For the forgoing reasons, Plaintiff's Amended Motion for Attorney's Fees [Document # 132] is hereby GRANTED, in the total sum of $349,243.96.

An Order consistent with this Memorandum Opinion will be filed contemporaneously herewith.

### ORDER

For the reasons set forth in the Memorandum Opinion filed contemporaneously herewith, IT IS ORDERED that Plaintiff Heather Sue Mercer's Amended Motion for Attorney's Fees [Document # 132] is GRANTED. IT IS FURTHER ORDERED that Defendant shall pay Plaintiff $349,243.96 in attorney's fees.